39 N.J. Super. 513 (1956)
121 A.2d 559
JULIUS SAND, T/A SCOTTY'S TRUCK TERMINAL, PLAINTIFF-APPELLANT,
v.
LONDON & COMPANY, INC., A CORPORATION OF THE STATE OF NEW JERSEY, ET AL., DEFENDANTS-RESPONDENTS.
Superior Court of New Jersey, Appellate Division.
Argued March 12, 1956.
Decided March 26, 1956.
*514 Before Judges CLAPP, JAYNE and FRANCIS.
Mr. William B. Kaufman argued the cause for the appellant (Messrs. Kaufman & Kaufman, attorneys).
Mr. Sanford Freedman argued the cause for the respondents (Mr. Max L. Rosenstein, attorney).
The opinion of the court was delivered by FRANCIS, J.A.D.
The Chancery Division declined to compel the defendant, Cortlandt Investors, Inc., to convey certain premises to the plaintiff, Julius Sand, trading as Scotty's Truck Terminal, pursuant to an option contained in a lease. Sand appeals.
The defendant, London & Company, Inc., owned a tract of land fronting on Woodruff Lane, Elizabeth, New Jersey. On August 1, 1950 it leased a portion thereof (described by metes and bounds) to plaintiff for a term of five years ending July 31, 1955. Provision was made for automatic renewal thereafter on a year-to-year basis subject to the right of either party to terminate on 90 days' notice prior to the expiration of any annual period.
The lease contained the following first refusal option to purchase:
"20. If at any time during the existence of this lease or any extension or renewal thereof, the landlord shall receive an offer for the sale of the particular lands demised herein to the tenant named herein, and as above described, and as appears on the sketch annexed hereto, the landlord agrees not to accept such offer or make any contract *515 of sale thereof, without first giving the tenant named herein an option to acquire and purchase said lands upon the same terms and conditions contained in such offer of purchase.
21. The landlord agrees to give the tenant notice in writing by registered mail of the terms and conditions of such offer, and if the tenant fails to enter into a bona fide contract upon the same terms and conditions as those proposed to the landlord by the prospective purchaser of said lands, within 10 days after the receipt of such registered notice, then the landlord shall have the right, and shall be at liberty to make a contract for the sale of said lands and may thereupon give notice of the termination of this lease to the tenant, as provided for herein."
On July 23, 1951 the lessor notified Sand that an offer had been received to buy a portion of the demised premises 100 feet by the full depth of the lot, approximately 370 feet. (The frontage of the leased premises was 125 feet.) The price proposed was 50¢ per square foot. Additional information was furnished also that the prospective purchaser was to have an option to buy the remaining easterly parcel of 100 foot frontage, within three years, at 55¢ a square foot. The name of the offeror was not given.
Plaintiff engaged counsel who looked into the matter and ascertained that no lower price would be entertained. Consequently he did not exercise the option to acquire ownership.
Thereafter, on October 30, 1951 London & Company, Inc., notified Sand that its property, including the demised land, had been sold to Cortlandt Investors, Inc., and that subsequently accruing rents should be paid to the new owner. Cortlandt Investors, Inc. sent a similar notice. The deed is dated October 24, 1951 and was recorded on the same day. Plaintiff was not advised that Cortlandt was not the prospective purchaser referred to in the July 23 notice. Attornment was made to the new owner and thereafter rent paid to it.
In July 1954 Cortlandt exercised the termination provision of the lease. Plaintiff then caused an examination to be made of the records and discovered that the deed bore revenue stamps indicating a purchase price of approximately 20.09 cents per square foot. In this same month he attempted *516 to take advantage of his option to buy at that price but London and Cortlandt refused.
This action was then brought to compel the sale to him at the price paid by Cortlandt. The claim to such relief was predicated upon a charge that the purchaser was aware of the lease provision conferring the option of first refusal on Sand and that acting in concert with London & Company, Inc., a fraudulent scheme was consummated to deprive him of his right to buy the property.
The trial court held that fraud had not been established. He declared also that the transaction between the corporations was not a sale but simply a transfer between two companies owned and controlled by the same interests; a shifting of the beneficial interest in the property from one hand to the other. He found on the evidence that the inducing motives were business convenience, the simplification of a federal tax problem of London & Company, and an improvement in the financial position of that company through the assumption of certain liabilities by Cortlandt Investors, Inc. Further, it was said that since the owners of the two companies were the same at the time of the conveyance (except for one share of Cortlandt stock held by a long time employee of London), and since the grantee took title with knowledge of the lease, the ownership was subject to Sand's option to purchase. So if Cortlandt had received an offer to sell prior to the termination of the lease, an obligation existed to give Sand an opportunity to buy at the same price.
On this appeal the allegation of fraud is not argued. The principal contention is that the conveyance to Cortlandt constituted an ordinary sale and by virtue of the option in the lease plaintiff was entitled to notice of the offer to purchase and an opportunity to meet the consideration proposed.
The obligation of a lessor under such a lease to give notice to the lessee of each proposal of sale received from a third person, is a continuing one; it remains throughout the term of the letting. A refusal by the lessee to meet one offer which the lessor himself ultimately rejects, does not *517 excuse the failure to report a subsequent one which is being considered. Until an offer which the lessee does not meet, is accepted by the lessor, the contractual stipulation to notify persists. Superior Portland Cement, Inc. v. Pacific Coast Cement Co., 33 Wash.2d 169, 205 P.2d 597 (Sup. Ct. 1949); R.F. Robinson Co. v. Drew, 83 N.H. 459, 144 A. 67 (Sup. Ct. 1928); Casto v. Cook, 91 W. Va. 209, 112 S.E. 502 (Sup. Ct. 1922); Jurgensen v. Morris, 194 App. Div. 92, 185 N.Y.S. 386 (App. Div. 1920); cf. Burleigh v. Mactier, 108 A. 84 (Ch. 1919, not in official reports); Race v. Groves, 43 N.J. Eq. 284 (E. & A. 1887). Thus if the Cortlandt transaction amounted to a sale, plaintiff should have been made aware of the terms proposed.
Decision on the point requires some reference to the facts.
London & Company, Inc. has been in the business of distilling liquor since 1933. The organizers and sole owners of the capital stock were Aaron London and Solomon Pitchenik. They are half-brothers. The ownership was unchanged at the time of the events under discussion.
The same persons organized Cortlandt Investors, Inc. in 1944 for the purpose of holding and dealing in real estate. Stock ownership was in London and Pitchenik. The testimony shows that Cortlandt acquired title to about fifteen pieces of real estate.
The property leased to plaintiff, as well as some adjacent land, was owned by London & Company. In April 1951 one Max Tieger, a real estate broker, indicated that a client of his was interested in purchasing the tract. Out of these negotiations came the notice to Sand of July 23, 1951 of the 50¢ a square foot offer. No sale was ever consummated.
At the inception of the Tieger dealings, the tract in question was subject to a federal tax lien against London & Company of about $100,000. In anticipation of a sale to Tieger's client or to the plaintiff, an agreement was obtained from the government to release the land from the lien upon the payment of $3,000. To obtain the money and other needed capital, London borrowed $10,000 by mortgaging the premises. On June 21, 1951 the mortgage was recorded. *518 Six days later a certificate of discharge of the tax lien was obtained and filed. Then in July plaintiff was advised formally of the Tieger offer.
In October 1951, the sale having fallen through and the land being free of the tax lien, London and Pitchenik decided to convey title to Cortlandt Investors, Inc., their real estate company. The influencing factors in the decision to do this were the London & Company's continuing tax problem and a desire to improve that company's financial position. To accomplish the latter, London was to be relieved of the burden of carrying the $10,000 mortgage on which there was then due $400 in interest; unpaid taxes on the property were to be assumed in the amount of $1,028.47; and Cortlandt took upon itself a $4,000 debt of London & Company to Aaron London for moneys previously advanced by him. The obligations so shifted to the books of Cortlandt aggregated $15,428.47. In addition, Pitchenik's mother and sister advanced $2,500 between them to Cortlandt, and one Doris Masarsky, the long time employee to whom reference has already been made, contributed $1,000 (for which she received the one share of stock mentioned). Of this $3,500 Cortlandt turned over to London & Company $3,371.53 in cash. In this way the financial standing of the latter company was improved by $18,800 and the revenue stamps on the deed are said to represent that consideration. Incidentally, it may be noted that the square foot area of the tract transferred was over twice as large as the leased property.
The trial court accepted the explanation of the conveyance as credible and his viewpoint is not challenged on this appeal.
On the facts outlined, manifestly the financial aspects of the affair were agreed upon without relation to the fair market value of the property conveyed. There is nothing about the negotiations of the parties to suggest arms' length dealing between an owner willing (but not forced) to sell, and a buyer willing (but not forced) to buy, which usually characterizes an open market sale. City of Trenton v. Lenzner, 16 N.J. 465, 476 (1954). And the trial court *519 found that the deed was not merely a device to circumvent the lessee's option to buy. In fact, he treated the conveyance as one which carried along with it the burden of the option.
London's testimony succinctly gives the reason for the transfer:
"Q. What was the purpose of transferring the title to this property from London & Company to Cortlandt Investors, Inc.? A. Well, we hoped to sell the property to Mr. Tieger's prospect or to Mr. Sand. Between the government taxes and bad business, we needed a little bit of money in our business. We figured maybe we could sell. Between both nothing turned out.
We got a mortgage of $10,000, I believe in June, and we put in our own money in October, and we practically brought into the business (London & Company) $18,000 more. [Insertion ours.]

* * * * * * * *
Q. Did you then have another purpose in addition to improving the financial position and financial picture of London & Company? A. Well, we didn't want to keep the liquor together with the real estate, and we transferred it and at the same time bettered the position of London & Company. It is owned by the same people; it wouldn't make any difference."
Under the circumstances presented, we agree with the trial court that the intercompany transfer did not constitute a sale within the contemplation of the lease. Its language intended a transmutation whereby the lessor would dispose of the property for value to a third person and cease to have any further interest in it. Here the lessors were the owners of the grantee. After the conveyance they remained in a position to control and dispose of the property. And the property continued subject to the lessee's first option to buy. Halsted v. Globe Indemnity Co., 258 N.Y. 176, 179 N.E. 376 (Ct. App. 1932).
In view of the foregoing, it is not necessary to consider the defense of laches raised by the defendants.
The judgment is affirmed.