511 P.2d 269

Stanley ISAACSON and Twila A. Isaacson, husband and wife, Plaintiff-Appellants,

v.

FIRST SECURITY BANK OF UTAH, et al., Defendants-Respondents.

No. 11115.

Supreme Court of Idaho.

June 29, 1973.

Don L. Harding, Malad City, and J. Dennis (J. D.) Williams, Boise, for plaintiffs-appellants.

Wesley F. Merrill, Merrill & Merrill, Pocatello, for defendants-respondents.

DONALDSON, Chief Justice.

The plaintiffs-appellants, Stanley and Twila Isaacson, brought this action against the defendants-respondents, First Security Bank of Utah and Melvin and Evelyn Richards, for specific performance of a right to purchase under a "first refusal" provision contained in a farm lease. The trial court denied specific performance on the ground that there had been no "sale" within the meaning of the "first refusal" provision of the lease. From the judgment entered in favor of the defendants, the lessees (plaintiffs-appellants) have appealed.

On March 7, 1966, the defendant bank, as trustee for Thomas W. Richards,[1] and as lessor, entered into a written lease with the Isaacsons, as lessees. The term of the lease was to expire on December 31, 1968, but by mutal agreement in writing it was subsequently extended until December 31, 1969. This action concerns the interpretation of the following paragraph of the lease:

> "In [the] event [lessor] desires to sell property included in this lease, [lessees] agree to yield and deliver up the said premises to [lessor], provided, however, that [lessees are] granted *first right of refusal to purchase premises*. It is understood that [lessees are] entitled to any crops that are in the process of growing at time of sale, should one occur." Plaintiffs' Exhibit A (emphasis added).

On November 21, 1969 (i.e., about a month before the lease would have expired), a trust officer for the defendant bank sent the lessees a letter which in pertinent part stated:

> "I talked with Dr. [Thomas W.] Richards about a new lease for you, however, he has now sold the farm to his son:
>
> Dr. Melvin M. Richards
> Box 942
> Pocatello, Idaho 83201
>
> So as of now we no longer have anything to do with the farm and you will no doubt want to contact Dr. Melvin Richards for your future arrangements."

Actually, when this letter was written, the farm had not yet been formally conveyed; not until December 5, 1969, did the defendant bank, as seller, enter into a "uniform real estate contract" and an "escrow agreement" with defendants Melvin and Evelyn Richards, as buyers. According to the sales contract, the buyers agreed to pay $25,000 for the subject property; however, the contract further provided that the buyers were to be granted a credit of $5,000 as a gift from the seller. The buyers have since paid the full $20,000 owing under the contract, in yearly installments. The contract specifically provided that no interest was to be charged on the unpaid portions of the purchase price. Although the written sales agreement does not mention any additional consideration, at trial Melvin Richards testified that his father offered to sell the property to him and his wife for $25,000, provided that they would, in addition to paying $20,000 cash, take care of his mother after his father's death and keep the farm "in the family" as a place for the family to retreat in case of severe economic depression. Melvin Richards also testified that he was not, at the time the sales contract was executed, aware of the "first refusal" provision contained in the lease entered into between the bank and the Isaacsons.

According to Melvin Richards' own testimony, "right after" the sale of the farm, he received from Mr. Isaacson a letter in which the latter asserted his right of first refusal. The following March (1970), however, Mr. Isaacson approached Melvin Richards in order to negotiate the terms of a new lease (not in an attempt to exercise his right to purchase). When a difference of opinion arose over the amount of rent to be paid, Mr. Isaacson then asked Mr. Richards whether he realized the lease gave Isaacson a right of first refusal. According to Isaacson's testimony, they

[1]. The provisions of this revocable trust do not appear in the record. Although these provisions are not at issue in this case, we note that the parties involved treated the defendant bank as more of an agent for the beneficiary than as an independent trustee. In any event, when the lease was entered into, the trustee bank held the legal title to the subject property and executed the formal documents; the rec-

ord indicates, however, that in its dealings with this real estate, the bank acted merely to carry out instructions received by it from the beneficial owner (Thomas W. Richards). Thus, although the property had never been removed from the trust, the bank recognized Thomas W. Richards' power to sell it to his son. See letter of November 21, 1969, quoted in pertinent part in the text.

agreed that he would lease the farm *until he could purchase it*. Richards denies having stated that *he* would sell Isaacson the property; but Richards did testify that in April, 1970, "I told him if he was so interested in buying the farm he could go down to the bank in Ogden, Utah, and make the deal with them and I'd withdraw the deposit I had made." According to Melvin Richards' deposition Mr. Isaacson never did approach the bank in regard to purchasing the property.

On April 13, 1971, the Isaacsons commenced this suit for specific performance. The trial court found that at the time of the sale by the elder Richards to his son, the farm was worth between $60,000 and $70,000. The court concluded that the transfer for $20,000 was "more of a gift than a sale" and "not a sale as contemplated by the lease."

The appellants in essence contend that the parties to the lease contemplated that the "first refusal" provision would apply whenever there was a "transfer of the farm from the control of the Richards' trust to another person * * * for money or its equivalent." The respondents, on the other hand, assert that the parties to the lease intended only an "arms' length" sale at or near "market value" to someone other than a member of the seller's family.

Relied upon by appellants is Meyer v. Warner, 104 Ariz. 44, 448 P.2d 394 (1968), wherein it was stated:

"[The defendants] argue that the above transfer was not a 'sale' within the provisions in the lease because [the lessor] sold the property simply to provide [the buyer] with a nice income for the remaining years of her life. *The transfer may well have been a gesture of friendship but we fail to see how it is any less a sale*." *Id.* at 398 (emphasis added).

Thus, say the appellants, the transfer here may well have been a gesture of familial devotion, but it was nevertheless a sale as contemplated by the lease. Also cited is the following language from Anderson v. Armour and Co., 205 Kan. 801, 473 P.2d 84 (1970):

"[W]hile it also is true that the deal between [the lessor] and [the buyer] involved an exchange of properties together with cash—the deed from [the lessor] recited 'bargain, sell and convey'. Further, as far as the [lessees] were concerned—the 13.75 acres were effectively 'sold' and placed beyond their reach— regardless of the details of the transaction between [the lessor] and [the buyer]." *Id.* at 89.

The appellants point out that in the sales contract executed by the defendant bank, it agreed "to sell and convey"; and, they say, regardless of the details of the transaction, the farm was effectively "sold" and placed beyond the Isaacsons' reach.

In support of their contention that no "sale" within the meaning of the lease occurred here, the respondents cite Kroehnke v. Zimmerman, 171 Colo. 365, 467 P.2d 265 (1970) (conveyance to family corporation controlled by the lessors) and Sand v. London & Co., 39 N.J.Super. 513, 121 A.2d 559 (1956) (transfer by corporate lessor to another corporation controlled by same owners). In both cases, it was noted that there was nothing in the record to suggest *"arms' length dealing* between an owner willing (but not forced) to sell, and a buyer willing (but not forced) to buy, which customarily characterizes a sale *in the open market*." 467 P.2d at 267; 121 A.2d at 562 (emphasis added). As in these cases, the transfer consummated here was not an open market sale resultant from "arms' length" dealing; rather, the evidence indicates the occurrence of a transfer from father to son of property worth at least three times the amount of monetary consideration paid by the transferee. While it is true that there is evidence of additional consideration in the form of the son's promise to take care of his mother, this promise may well be deemed non-detrimental in light of the son's testimony, elicited on cross examination, that he would have taken care of his mother even in the

absence of any contractual obligation to do so. Similarly, since the son was not conveyed a defeasible fee, the father's precatory request that he keep the farm in the family cannot be considered detrimental. Rather than evincing additional consideration, the proviso insisted upon by the father—i. e., that his son would take care of his mother and keep the farm in the family—evinces the father's reasons for transferring the property to his son; this proviso constitutes evidence of the father's donative intent and of his motives for conferring upon his son a gift of at least two-thirds the value of the property. While the handling of the transaction by the United States Internal Revenue Service is by no means dispositive, it is noteworthy that it treated the transfer as a gift (in contemplation of death), to the extent that the value of the property exceeded the $20,000 actually paid to the father by the son; the Richards trust has paid the estate tax assessed by the I.R.S. on this basis.

■ If the father had conferred an outright gift upon the son—i. e., had transferred the property in question to him for no consideration whatsoever—it could not be successfully contended that the appellants' right of first refusal would thereby have been triggered. Where the lessor has indicated his desire to *give* and not to *sell* the property subject to the right of first refusal, it cannot be said that the condition precedent[2] to the ripening of the right of first refusal has been fulfilled.

■ While the transaction at issue partook of the form of a sale, we have no doubt that the trial court was correct in concluding that the transfer was more of a gift than a sale. The district court correctly went behind the formal sales agreement and determined the actual nature of the transaction, which cannot properly be characterized as a "sale" within the meaning of the contract entered into by the parties in this case.

■ It is undeniable that by the transaction between the father's trustee and the son, the property was effectively transferred to a new owner; but this does not mean that the property was "placed beyond the lessees' reach," as they submit. Had the donee desired to consummate a bona fide arm's length sale prior to December 31, 1969, he could not have done so without first offering the property to the lessees on the same terms he would have been willing to sell to anyone else. *See* Damiano v. Finney, 93 Idaho 482, 464 P.2d 522 (1970). Until the lease was terminated, the donee-landlord's right to sell the property was subject to the lessee's right of first refusal contained in the lease agreement. Kroehnke v. Zimmerman, *supra*; Straley v. Osborne, 262 Md. 514, 278 A.2d 64 (1971); Sand v. London & Co., *supra*. Therefore, the property was within the lessees' reach to the same extent that it always had been—but their right to purchase would ripen only in the event the lessor desired to sell during the term of the leasehold. We note, moreover, that the effect upon the lessees—i. e., a change in landlords—would have been the same if an unequivocal gift of the reversionary interest had taken place.

The district court correctly decided that the transfer to Melvin Richards was not a "sale" within the meaning of the first refusal provision of the lease; that is, it was not a "sale" as contemplated by the parties to the lease agreement. This conclusion makes it unnecessary for this Court to consider whether the lessees' right of first refusal was to become effective only when a sale by the lessor forced the lessees to "yield and deliver up said premises" before the expiration of the term of the lease. *See* Gill v. Livingston, 158 Fla. 577, 29 So.2d 631 (1947); Gulf Theatres v. Guardian Life Ins. Co., 157 Fla. 428, 26 So.2d 188 (1946); Hinds v. Madison, 424 S.W.2d 61 (TexCiv.App.1967).

Judgment affirmed. Costs to respondents.

2. "In the event [lessor] desires to sell property included in this lease * * *."

SHEPARD, McQUADE and Mc-FADDEN, JJ., concur.

BAKES, Justice (concurring specially):

I concur in the result reached by the majority for the additional reason that, in my opinion, the phrase in the lease, "provided, however, that said party of the second part is granted first right of refusal to purchase premises," is not a sufficient legal articulation of the rights intended to be granted in order to enforce that provision. I think it presumes too much to ask a court to conclude the sale of a substantial amount of real property based upon such meager expression of the parties' intentions, and no details as to how, when and with what formalities the so-called "first right of refusal" is to be consummated.