**LEHN'S COURT MANAGEMENT LLC., Appellant,**

v.

**MY MOUNA INC., Chicken George's Palace Inc. and Georges K. Moussa, Appellees.**

Superior Court of Pennsylvania.

Argued Oct. 7, 2003.
Filed Nov. 18, 2003.

Douglas J. Tkacik, Bethlehem, for appellant.

Edward P. Shaughnessy, Easton, for appellee.

BEFORE: STEVENS, OLSZEWSKI, and BECK, JJ.

OPINION BY OLSZEWSKI, J.:

¶ 1 The lower court granted defendants' demurrer and dismissed plaintiff's complaint with prejudice. To determine whether plaintiff's complaint "is clearly insufficient to establish [his] right to relief," this Court must assume as true "all well-pleaded, material, relevant facts...and every inference fairly deducible from those facts." *County of Allegheny v. Commonwealth*, 507 Pa. 360, 372, 490 A.2d 402, 408 (1985). Using this standard, the facts are as follows.

¶ 2 Plaintiff/appellant in this case is Lehn's Court Management, L.L.C. It is a

Pennsylvania corporation and has its offices in Easton, Pennsylvania. On June 8, 2000, appellant entered into a written lease agreement with My Mouna, Inc. and Chicken George's Palace, Inc., defendants/appellees in the case. The term of the lease is initially for five years, but Lehn's is also given the option to renew for three additional five-year terms. Paragraph 18 of the written lease is the seed of this lawsuit. This paragraph states:

18. Right of First Refusal.

During the term of this lease or any subsequent renewal, should Landlord receive an offer to purchase the property or any of the leased assets, and Landlord desires to accept said offer, or should Landlord make an offer to sell the property or any of the leased assets, Landlord shall provide Tenant forty-five (45) days written notice of such offer, setting forth the name and address of the proposed purchased, the amount of the proposed purchase price, and all other terms and conditions of such offer. Tenant shall have the first option to purchase the property which is subject to the offer by giving written notice to Landlord of its intention to purchase within said forty-five (45) day period at the same price and on the same terms of any such offer. In the event Tenant accepts said offer, Landlord shall convey marketable title to the real estate by good and sufficient warranty deed at the time of settlement.

¶ 3 The same day that the lease was signed, the parties signed a "Memorandum of Right of First Refusal" which reiterated the terms found in Paragraph 18.

¶ 4 On July 10, 2002, defendant/appellee My Mouna, Inc. filed a deed dated July 5, 2002, in the Northampton County Recorder of Deeds Office. This deed transferred title of the property in question to Georges K. Moussa for $60,000. Georges K. Moussa was also a defendant in the lower action and owns 100% of the shares of both My Mouna, Inc. and Chicken George's Palace, Inc.

¶ 5 Lehn's Court sued defendants/appellees, alleging that they transferred the real estate without giving it proper notice and in derogation of its right of first refusal. Among appellant's prayers for relief: (1) that the court set aside the prior transfer between My Mouna, Inc. and Georges K. Moussa; and (2) an order requiring that the defendant transfer the subject property to Lehn's Court for $60,000.

¶ 6 The lower court granted defendants/appellees' demurrer, declaring that "[u]nder the circumstances presented, the transfer between the companies and the sole owner did not constitute a sale within the contemplation of the lease." Trial Court Opinion, 3/19/03, at 6. Since the transfer of the property was not a sale, appellant did not have a right of first refusal. Thus, the complaint did not state a claim for which relief could be granted. *Id.*

*ISSUES*

¶ 7 Lehn's Court has appealed the trial judge's decision. First, appellant argues that the judge erred when it determined, as a matter of law, that the corporation's transfer of the real estate to its only shareholder did not trigger the right of first refusal provision in the lease. Second, appellant declares that it was error for the judge to find that its complaint failed to state a cause of action for specific performance. This argument, however, necessarily hinges upon the resolution of appellant's first contention. Finally, appellant argues that the grant of demurrer in the case was improper.

*DISCUSSION*

■ ¶ 8 Appellant's first argument is that when My Mouna, Inc. transferred the

burdened real estate interest to its sole shareholder, appellant's right of first refusal was activated. If this is true, My Mouna, Inc. breached the lease agreement with appellant by not notifying appellant of the real estate transfer. This is the first time the Pennsylvania appellate courts have been confronted with such an argument. When dealing with issues of first impression, the Superior Court's job is to "predict" how the Pennsylvania Supreme Court would reason and resolve the issue. *Brown v. Candelora*, 708 A.2d 104, 112 n. 7 (Pa.Super.1998). To do this, we will first analyze the policy behind right of first refusal provisions in lease contracts; second, look at how Pennsylvania courts have dealt with similar issues regarding transfers in the face of first refusal provisions; third, determine how other jurisdictions have analyzed the current issue; and finally, apply what we have learned to our facts.

### The Policy Behind Rights of First Refusal

¶ 9 In the landlord-tenant context, the tenant usually holds the right of first refusal at the expense of the owner/landlord. It is a valuable right that the tenant holds and is the result of a bargained-for exchange. 1A Arthur Linton Corbin, *Corbin on Contracts* § 261 (1963). Simply stated, it is a right that tenant will be given the first chance to purchase the property before owner sells his property to another. It operates in two ways. First, if owner receives an offer from a third-party for his land *and* owner decides to sell, owner must first offer the property to tenant. The terms of owner's offer to tenant are identical to those contained in the third-party's offer. Second, if owner initiates everything and decides to sell his property, his first offer must be to tenant. In neither case can tenant force owner to sell. Before tenant's right of first refusal

comes into effect, owner has already come to the good faith conclusion that he wishes to dispose of his property. Further, tenant is never forced to buy the property: he is always free to not exercise his right. All of this amounts to a small restraint on alienation that the law has allowed.

¶ 10 Why would the parties include such a clause in a lease? Or, more importantly for the resolution of the instant case, why would tenant bargain for such a right? One reason might be that tenant really wishes to purchase the property, but that owner is just not ready to sell at that time. Because information is sometimes asymmetrical, tenant might desire the certainty that he will be first in line to purchase when and if owner decides to sell. This lack of information rationale can also apply to the argument that the right of first refusal facilitates tenant's improvement of the premises. He can improve the building and not have to worry whether he will have the chance to buy the place when owner sells. Also, as David I. Walker explained: "[the right of first refusal] provides some security to the lessee. Although the sale of the property would not disrupt the lease, the lessee may care about the identity of his lessor. Under this arrangement, if the owner decides to sell, the lessee will at least be given the opportunity to purchase." *Rethinking Rights of First Refusal*, 5 Stan. J.L. Bus. & Fin. 1, 8 (1999).

### Pennsylvania Case Law

¶ 11 Although Pennsylvania courts have not dealt with situations like the instant case, our courts have held that the right of first refusal is not activated in every transfer of property from one entity to another.

¶ 12 In *Mericle v. Wolf*, the Pennsylvania Superior Court held that a gratuitous transfer of real property to a hospital did

not trigger the right of first refusal. 386 Pa.Super. 82, 562 A.2d 364, 365 (1989). Here, appellant Mericle leased space in a building that the Wolfs owned and in the lease agreement Mericle was given a right of first refusal. When the Wolfs transferred the building to Sacred Heart Hospital as a gift, Mericle sued.

¶ 13 Mericle argued that "the purpose of the right of first refusal clause was the protection and continuation of his business, and the transfer of the property, whether by sale or gift, defeated that purpose." *Id.* The Superior Court applied general contract principles to the lease. It found what the parties actually agreed to was the Wolfs would "give lessee first refusal at buyer's price if property is to be sold." *Id.* at 366. The Court found that "this language demonstrates an intent on the part of the parties that the right of first refusal would come into play upon the exchange of consideration at buyer's price." *Id.* A "sale", the Court stated, "contemplates a vendor and a buyer and the transfer involves payment or a promise to pay a certain price in money or its equivalent." *Id.* at 367. Since the transfer between the Wolfs and the hospital was by way of gift, the "right of first refusal never came into effect."

¶ 14 The *Mericle* Court distinguished the case before it from the Pennsylvania Supreme Court case of *Warden v. Taylor.* 460 Pa. 577, 333 A.2d 922 (1975). In that case, Taylor (the owner of the land) gifted the land to his grandson. The land, however, was burdened by John Warden's right of first refusal to repurchase the land. Warden's right was expressed as: "If...[Taylor and his now-deceased wife] decide to *sell and convey*...the farm...Warden shall have the first right and privilege to purchase said farm at and for the price of Four Thousand Dollars...." *Warden,* 460 Pa. at 578, 333

A.2d at 923 (emphasis added). The Supreme Court found that Warden's right of first refusal as expressed in the contract was triggered when Taylor gifted the real estate to a third-party. It was the specific words in the contract that led the Supreme Court's holding that "a conveyance alone would trigger the first right of purchase." *Mericle,* 562 A.2d at 367. Further, "an agreed payment was included upon repurchase." *Id.*

¶ 15 The case at bar differs from both *Mericle* and *Warden* in three respects. First, the transfer of land was from a corporation to its sole shareholder. Second, (as can be inferred from appellant's complaint) a substantial sum of money ($60,000) was given in exchange for the land. Third, in the instant case the right of first refusal is phrased as: "should Landlord receive an offer to purchase the property...and Landlord desires to accept said offer, or should Landlord *make an offer to sell* the property....." (emphasis added). Thus, neither *Mericle* nor *Warden* provides a direct answer to the instant case. We will now analyze how other jurisdictions have dealt with cases similar to the one we have before us now.

*Case Law of Other Jurisdictions*

¶ 16 In *Kroehnke v. Zimmerman,* the Supreme Court of Colorado was faced with a transfer of burdened property from an individual to his solely owned corporation. 171 Colo. 365, 467 P.2d 265 (1970). Here, the Zimmermans were owners of real estate. They entered into a ten-year lease with the Kroehnkes and included a right of first refusal provision in the lease. This provision was phrased as: "if [the Zimmermans] *should desire to sell* the demised premises, then the lessees [the Kroehnkes] shall have the privilege of purchasing the same for the same price for which the lessors [Zimmermans] would be willing to

sell to *any other person."* *Id.* at 265 (emphasis added).

¶ 17 A year later, the Zimmermans organized a corporation, Coloevans, Inc., under Colorado law. Zimmermans then conveyed the subject property to the corporation, subject to the existing rights contained in the lease with the Kroehnkes. In exchange for the property, the corporation issued its stock and a promissory note to the Zimmermans, who were the sole shareholders of Coloevans, Inc. When the Kroehnkes found out about this transfer, they sued the Zimmermans, attempting to invoke their right of first refusal. *Id.* at 266.

¶ 18 The court declared: "[t]he issue reduces itself to the question of whether the transfer of title by the individual owners to a corporation in which the grantors own all of the stock constitutes a sale to 'any other person.'" *Id.* at 267. While the court noted that consideration was given for the transfer of title, it found "there is nothing in the record to suggest arms' length dealing between an owner willing (but not forced) to sell, and a buyer willing (but not forced) to buy, which customarily characterizes a sale in the open market." *Id.* This transfer was "solely for the convenience of the lessors in managing the property." Thus, the court concluded that there was no "sale" between the owners and their corporation. As no sale occurred, the Kroehnkes' right of first refusal was not activated. *Id.*

¶ 19 *Belliveau v. O'Coin* also dealt with the transfer of burdened land from an owner to her solely owned corporation. 557 A.2d 75 (R.I.1989). Owner Belliveau rented property to O'Coin, granting him a right of first refusal stating that the owner "shall not *rent, sell or convey* the said premises...to any prospective tenant or purchaser" without giving O'Coin his right of first refusal. *Id.* at 76 (emphasis add-

ed). Belliveau transferred this property to her solely owned corporation for $60,000. The purpose of this transfer was to take advantage of favorable federal income tax laws. Later on, the corporation entered into an agreement to sell the land for $349,000. O'Coin sued, stating that his right of first refusal came into effect under the first transaction. Thus, he argued that he should have been given the right to purchase the property for $60,000. *Id.*

¶ 20 The court held the conveyance of the property to the corporation did not trigger O'Coin's right of first refusal for two reasons: "[f]irst, the conveyance was made solely for legitimate tax-avoidance reasons." *Id.* at 78. Thus, nothing in the transaction indicated the "type of arms' length dealing" as normally found in market transactions. Second, "the conveyance at issue resulted in no significant transfer of ownership interest. None of the parties involved in this case were strangers to one another." *Id.* They were not strangers since the O'Coins knew about the corporation: the corporation itself was building the O'Coins' house. In conclusion, the court stated: the "right of first refusal simply does not apply to a conveyance between related, interested parties in circumstances in which that conveyance is made solely for the purpose of managing the property's development." *Id.* at 79.

¶ 21 The Superior Court of New Jersey was faced with a question similar to the two above cases. *Sand v. London & Company, Inc.* involved the transfer of burdened land from one corporation to another corporation with both corporations having identical stockholders. 39 N.J.Super. 513, 121 A.2d 559 (App.Div.1956). Here, London & Co., Inc. was the owner of the land and it leased the land to Sand for five years. The lease contained a right of first refusal provision declaring if "the landlord shall receive an *offer for the*

*sale...* " the landlord must give Sand the right of first refusal. *Id.* at 559 (emphasis added). London & Co., however, sold the land to Cortlandt Investors, Inc. (a company owned by the same people) for well below market price. Sand sued and demanded that the court give effect to his right of first refusal. *Id.* at 561. The court found that no fraud was involved in the dealing, since Sand still retained his right of first refusal in the lease. Further, the court declared that the transfer of the land was not a sale within the language of the lease. Rather, even after the transfer of the land, the original owners "remained in a position to control and dispose of the property." *Id.* at 562.

¶ 22 In contrast to the above cases, in *Prince v. Elm Investment Co.* the Supreme Court of Utah held for the rightholder. The court, however, was guided by the above cases and distinguished its case from the others by its own specific facts. 649 P.2d 820 (Utah 1982).

¶ 23 Elm Investment Co. owned certain land in Salt Lake City. The corporation leased the land to Trolly, and in the lease Trolly was given the right of first refusal. This right would come into effect if the property was "offered for sale." *Id.* at 821. Later, Elm Investment Co. entered into a partnership agreement with Boyer–Gardner to "acquire, improve, lease and manage" the burdened property. Elm owned fifty-one percent and Boyer–Gardner owned forty-nine percent of the partnership. Elm agreed to contribute the property to the partnership, and Boyer–Gardner gave consideration for the property. Importantly, however, the partnership agreement specified that "all decisions and actions" of the partnership "shall require the unanimous consent of the Partners." Elm did not give notice to Trolly concerning the conveyance of the property and did not allow Trolly to match the Boyer–Gard-

ner offer. Trolly then sued, seeking to assert its right of first refusal. *Id.*

¶ 24 The *Prince* court began its discussion by noting that "Trolly's right to purchase the leased property is triggered only by Elm's offering it 'for sale.' " *Id.* at 822. After the court looked at precedent from other jurisdictions concerning the transfer of burdened property, it found: "for purposes of a right of first refusal, a 'sale' occurs upon the transfer (a) for value (b) of a significant interest in the subject property (c) to a stranger to the lease, (d) who thereby gains substantial control over the leased property." *Id.* at 823. In its case, the court found that all four elements were met:

(a) The transfer was for value. (b) Because of its forty-nine percent interest in the Partnership, Elm transferred and Boyer–Gardner received a significant interest in the leased property. (c) Boyer–Gardner was a stranger to the Elm–Trolly lease. (d) Because of the terms of the Partnership, Boyer–Gardner gained substantial control (in effect, a veto power) over the leased property as a result of the transfer. *Id.*

Thus, because Elm transferred its interest in the land to an entity unknown to Trolly and because this stranger could now *control its lease* via its veto power, Trolly was, in effect, under new management. The court held that this transaction activated Trolly's right of first refusal. *Id.*

*Application of the Principles to the Current Case*

¶ 25 Coming back to the case that confronts us now, we too must determine what the word "sale" means in Lehn's Court's right of first refusal. The reason for this is the lease provision explicitly states: Lehn's Court's right is activated upon the Owner's "*offer to sell* " the premises. Since "a lease is in the nature

of a contract and is controlled by principles of contract law," to determine what this word means, we must look to contract law and general contract principles. *Amoco Oil Co. v. Snyder,* 505 Pa. 214, 220, 478 A.2d 795, 798 (1984).

¶ 26 We believe that *Prince's* definition of "sale" for purposes of the right of first refusal adequately protects the right-holder's interests and comports with the intent of the parties at the time the lease was entered into. As the definition of "sale" is important to the right of first refusal, the *Prince* definition recognizes the right of first refusal as a valuable right. The definition also recognizes that the lessee has bargained for his right: the lessee is attempting to safeguard the interest he has in the identity of his landlord. Finally, the lessee's right of first refusal will survive the transfer of the property, not because of anything found in *Prince,* but as our Supreme Court has found, as a matter of law. *Atlantic Refining Co. v. Wyoming Nat'l Bank,* 356 Pa. 226, 235–236, 51 A.2d 719, 724 (1947). It is our belief that the Pennsylvania Supreme Court would accept this definition of "sale" also.

¶ 27 Thus, we must now apply the *Prince* test to the situation that currently confronts us. The first two elements are easily met in the current situation. First, the transfer of the property was for $60,000, and thus "for value." Second, My Mouna, Inc. did transfer a "significant interest" in the burdened property to Georges K. Moussa: it transferred the entire interest in the property. But the last two elements are not met, thus defeating Lehn's Court's claim that their right of first refusal was triggered by the transaction. Georges K. Moussa was no "stranger to the lease." Rather: the lease stated Moussa was "the 100% shareholder, sole director and President of Chicken George's Palace, Inc. and My Mouna Inc.";

the lease stated that George Moussa was "the exclusive agent to collect and receive payments on behalf of" the two corporations; and finally, Moussa himself signed the lease and the "Memorandum of Right of First Refusal" that appellant has incorporated into the complaint. Finally, no stranger gained "substantial control over the leased property." *Prince,* 649 P.2d at 823.

¶ 28 That the transfer between My Mouna, Inc. and Georges K. Moussa did not activate Lehn's right of first refusal fully comports with the intention of the parties at the time they entered into the lease. This provision was intended to safeguard Lehn's relationship with their landlord. If the owner was going to sell to an entity that Lehn's did not care for, Lehn's was given the ability to purchase the premises. The transfer has not changed Lehn's position. Rather, as the trial judge stated: "this transfer was a change in name and legal entity alone." Trial Court Opinion, 3/19/03 at 5. Also, "the property remains subject to [Lehn's] first option to buy on any terms agreed by Moussa and a valid third party." *Id.* at 6.

¶ 29 Thus, like the trial court, we believe that the transaction at issue was not a "sale" according to the terms of the lease and did not activate Lehn's Court's right of first refusal. Lehn's Court, however, makes a novel argument that, even assuming that they cannot recover in this lawsuit, the grant of a demurrer was improper since this case is one of first impression. In making this argument, Lehn's Court latches onto the verbiage found in our precedent stating, for instance: "[t]he question presented by the demurrer is whether, on the facts averred, the law says with certainty that no recovery is possible" *Juban v. Schermer,* 751 A.2d 1190, 1192 (Pa.Super.2000); and "in the face of a demurrer, a complaint should only be dis-

missed in cases that are free and clear from doubt." *Donahue v. Federal Express Corp.,* 753 A.2d 238, 241 (Pa.Super.2000). Without any prevailing case law in the Commonwealth that controls the issue here, Lehn's Court argues that "the issue cannot possibly be considered free and clear from doubt."

¶ 30 What Lehn's Court forgets is that the trial is a fact-finding process. If the law will not allow a plaintiff to recover based on the facts stated in their complaint, there is no need to subject the parties and the burdened judicial system to a time-consuming, expensive, and stressful trial. If a trial did occur in this case and Lehn's Court proved every fact it set out to prove, it would still find no relief from a court in the Commonwealth. That is the reason why we have a demurrer and, in the same vein, summary judgment.

¶ 31 It is very rare for a conflict to actually go to trial if there is prior precedent that is unequivocally controlling. If we had a judicial outcome preordained for every single combination of facts possible in the world, the "man who had the best card index of the cases would also be the wisest judge." Benjamin N. Cardozo, *The Nature of the Judicial Process* 20 (1921). Yet, "the reality is that fact complexes seldom are repeated exactly." Ruggero J. Aldisert, *The Judicial Process, Readings, Materials and Cases* 819 (1976). What Lehn's Court is attempting to do is relegate both the demurrer and summary judgment rules to cases which "run on all fours" with a prior case. Thus, these rules would only be used when a court was confronted with facts absolutely identical to those of a prior-decided case; since, in reality, that is the only time that the applicable law will be totally "free and clear from doubt." Such a method would be permissible if we were starting the entire

judicial system anew, but it is not the law of Pennsylvania.

¶ 32 To the extent our prior phrasing of the issue is confusing, we reiterate the Pennsylvania Supreme Court's declaration of the proper demurrer standard:

> The test...is not whether the applicable law is clear and free from doubt, *but whether it is clear and free from doubt from the facts pleaded that the pleader will be unable to prove facts legally sufficient to establish his right to relief.* The role of the court in ruling on preliminary objections in the nature of a demurrer is to determine whether or not the facts pleaded are legally sufficient to permit the action to continue. This is so whether the legal determination to be made is relatively simple or relatively difficult.

*Firing v. Kephart,* 466 Pa. 560, 563, 353 A.2d 833, 834 (1976) (emphasis added).

¶ 33 In conclusion, it was not error for the trial judge to sustain appellees' demurrer.

¶ 34 Order AFFIRMED.