Filed 6/10/14  Gidding v. Salama CA1/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| JOHN GIDDING et al.,<br><br>　　　Plaintiffs and Appellants,<br><br>v.<br><br>JOSEPH SALAMA et al.,<br><br>　　　Defendants and Respondents. | A136071<br><br>(San Francisco City and County<br>Super. Ct. No. CGC-11-507519) |

John Gidding, on behalf of himself and his company, Midshore Marketing, LP (Midshore) (collectively plaintiffs), appeals after the trial court granted the motion for reconsideration and enforcement of the parties' settlement agreement brought by defendants Joseph Salama, John Schilt, and Tenax Law Group PC (Tenax) (collectively defendants), in this legal malpractice action.  Gidding contends (1) because the settlement agreement was ambiguous as to the need for the signatures of defendants' counsel, it must be interpreted in favor of his position that counsel's failure to sign the agreement before he repudiated it rendered it unenforceable; (2) substantial evidence does not support the trial court's conclusion, based on extrinsic evidence, that the agreement did not have to be signed by defendants' counsel to be enforceable; and (3) defendants' counsel's false promises and representations induced him to sign the agreement.  We shall affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

Gidding is the sole managing partner of Midshore and the founder of Pivotal, Inc., a wine importing company.  Pivotal imported wines from, inter alia, Glendonbrook

Wines Pty Ltd. (Glendonbrook), an Australian winery. Following a dispute over title to $45,000 of Glendonbrook's wines, Gidding, Midshore, and Pivotal filed a defamation action against Glendonbrook, and Glendonbrook filed a cross-complaint. Salama helped to research and draft the complaint and the answer to the cross-complaint. After Salama moved to Tenax, at which Schilt was the "main attorney," he resumed work on the case, at Gidding's request.

At the conclusion of a January 2010 trial, Glendonbrook obtained a $1,830,000 judgment against Gidding, Midshore, and Pivotal. The judgment included $1,150,000 in punitive damages, which the court reduced by $704,000. Gidding and Midshore subsequently dismissed an appeal under the terms of a partial settlement with Glendonbrook, pursuant to which the judgment was reduced to $488,696.96. As of October 28, 2011, the amount still owed was $389,665.71.

On January 21, 2011, Gidding filed a complaint against defendants for legal malpractice and breach of fiduciary duty. In September 2011, George Ziser, an attorney with the law firm Lewis, Brisbois, Bisgaard & Smith, who represented Schilt and Tenax, engaged in settlement discussions with Gidding.[1] The parties eventually agreed to settle the case for $125,000, with $100,000 coming from Tenax's malpractice insurance carrier and $25,000 coming from Salama's carrier. On August 18, 2011, Gidding wrote to Ziser that the settlement agreement should, inter alia, "encompass all the defendants in the . . . case, i.e., your clients, John Schilt and Tenax Law Group PC, and Jeffrey [*sic*] Lawniczak's client, Joseph Salama," and should "definitely extinguish all claims, past, present, and future, between plaintiffs John Gidding and Midshore Marketing, and defendants John Schilt, Tenax Law Group PC, and Joseph Salama."

Ziser and his associate, Kendall Layne, drafted a settlement agreement, which was later revised to include Schilt's insurer, American Guarantee & Liability Insurance Company (American), as a specifically identified releasee. The first paragraph of the settlement agreement states that the settling parties are Gidding, Midshore, Salama,

---

[1] Stephen Lawniczak from the firm Gordon & Rees represented Salama.

Schilt, and Tenax. The agreement also contains three release paragraphs: in the first, Gidding and Midshore release Salama, Schilt, Tenax, and American; in the second, Salama releases Gidding, Midshore, Schilt, Tenax, and American; and in the third, Schilt and Tenax release Gidding, Midshore, Salama, and American. Under the terms of the agreement, within 30 days of receipt of counterpart originals of the agreement fully executed by the parties, Schilt and Tenax agree to pay plaintiffs $100,000 and Salama agrees to pay plaintiffs $25,000. The agreement contains an integration clause, and further provides that the settling parties had the opportunity to consult with counsel regarding the legal effect of the agreement and have freely entered into the agreement.

Gidding signed the settlement agreement on September 19, 2011. Salama signed the agreement on September 20, and his attorney, Stephen Lawniczak, signed it on September 21, beneath Salama's signature and directly under a caption that reads, "Approved as to form." On September 26, Schilt signed on behalf of himself and Tenax.

On September 26, 2011, Glendonbrook, as a judgment creditor, filed a notice of lien on plaintiffs' cause of action in the present lawsuit, in which it stated that the amount required to satisfy the judgment was $488,696.96. Shortly thereafter, Gidding and Ziser exchanged emails in which they discussed the effect of the lien on the malpractice settlement. On October 1, Ziser wrote that he was unsure of the lien's effect on the settlement. On October 2, Gidding responded that "the settlement was negotiated in good faith and settled, before the lien appeared." Gidding sent another email on October 4, in which he stated, inter alia, "As both parties signed the Settlement agreement on and before September 21st, i.e., we have a deal. The lien, dated September 26th, came after the deal. I think you must send me the checks, post haste."

A few weeks later, on October 26, 2011, Gidding sent an email to Layne and Ziser, in which he wrote that he was back in the United States, but had not received the settlement money. He again asked that "the checks" be sent to him. On October 28, Ziser responded that he had been contacted by Glendonbrook's attorney, who had advised Ziser that he would be filing an application for an assignment order, which would require Ziser to send the settlement funds to Glendonbrook, in partial satisfaction of the

3

judgment against plaintiffs. Ziser further wrote that, if the application were denied, he could send the check to Gidding but, if it were granted, he would have to send the settlement money to Glendonbrook. Two days later, on October 30, Gidding sent an email to Ziser, in which he wrote, "On September 21st, when you failed to return the completed settlement agreements duly signed by all parties, as promised, . . . the settlement died." He explained that he had planned to use the settlement money to bargain with Glendonbrook, rather than declare bankruptcy, but that he now planned to declare bankruptcy. The following day, on October 31, Ziser signed the settlement agreement beneath Schilt's signatures and directly under the caption, "Approved as to form."

On November 4, 2011, Schilt and Tenax moved to enforce the settlement agreement, pursuant to Code of Civil Procedure section 664.6.[2]

In a tentative decision, the trial court indicated that it intended to grant the motion to enforce the settlement agreement because Gidding "has not shown that Mr. Ziser's execution of the agreement was required for it to be effective." However, following the parties' argument at the December 16, 2011, hearing on the motion, the court changed its ruling, explaining that, as a non-lawyer, "it might be reasonable for Mr. Gidding to think that this agreement wouldn't be effective until all signature lines had been signed," and that he might reasonably believe that the insurance company is a party since it was providing the money for the settlement and "there's nobody signing this who's got any connection with the insurance company, or at least who has claimed to have spoken for them, except you, Mr. Ziser, and there's a line for your signature, and you didn't sign." The court continued, "From a self-represented litigant's point of view, there's ambiguity; and ambiguity is to be construed against the drafter." The court therefore denied the motion to enforce the settlement agreement.

---

[2] All further statutory references are to the Code of Civil Procedure unless otherwise indicated.

4

On January 10, 2012, Schilt and Tenax filed a motion for reconsideration based on new or different facts or law that the court had not considered at the hearing on the original motion, "and that could not with diligence have been brought to the court's attention at [that] hearing, in that the tentative ruling was to grant the motion, and the court's denial of the motion was on a ground raised sua sponte by the court during the hearing, not disclosed in the papers filed in support of or in opposition to the motion, and not consistent with. . . [recent case authority regarding] whose signatures must appear on a settlement agreement in order for it to be enforceable under . . . section 664.6." The allegation of new or different facts was based on Gidding's October 4, 2011, email, in which he wrote, "we have a deal," since "both parties" had signed the settlement agreement before Glendonbrook filed its lien.

On February 21, 2012, following a hearing, the trial court granted the motion for reconsideration and ordered enforcement of the settlement agreement pursuant to section 664.6. The court explained its decision as follows: "The sole substantive issue on this motion is a simple one of contract interpretation—i.e., whether the signature of either Mr. Ziser or Mr. Layne was required to make the parties' settlement contract enforceable. While the issue is simple, its resolution is a close call.

"As an initial matter, I find, per well-settled California contract principles, that the agreement is ambiguous and is reasonably susceptible to the interpretations proffered by both Gidding and the Schilt defendants. Thus, I need to resort to extrinsic evidence. There is extrinsic evidence favoring each side. Ultimately, however, I find Gidding's October 4 email to be dispositive. In that email, at a time when Gidding did not know and had not been told that either Ziser or Layne had signed the agreement, Gidding wrote that 'we have a deal.' While Gidding claims that he wrote that email under the assumption that Ziser or Layne had signed the agreement, nothing in the October 4 email or in any of the other extrinsic evidence provided to me states or suggests that Ziser or Layne had signed the agreement by October 4, and it is undisputed that neither had done so. If, as Gidding later claimed, it was critical to the enforceability of the agreement that

5

Ziser or Layne sign it, then it stands to reason that, before writing that 'we have a deal,' Gidding would have determined whether Ziser or Layne signed the agreement.

"The October 4 email is a new fact that warrants reconsideration of my prior ruling denying the Schilt Defendants' motion to enforce the settlement agreement." The court then vacated its prior order denying the motion to enforce the settlement agreement and found that the agreement was enforceable pursuant to section 664.6, "notwithstanding that neither Ziser nor Layne signed it until October 31, 2011, a day after Gidding purported to cancel the agreement."

Subsequently, on April 23, 2012, the trial court denied Gidding's motion for reconsideration of the order granting defendants' motion to enforce the settlement agreement, after finding that Gidding had not presented any new facts or law to support such a motion and that the prior order enforcing the settlement agreement was properly decided.

On May 25, 2012, the trial court granted defendants' motion requesting that it order them to pay the $125,000 in settlement funds to Glendonbrook once the court's judgment of dismissal became final, or to otherwise disburse the funds in accordance with any direction from the Court of Appeal, if this court did not affirm the trial court's order enforcing the settlement agreement.

On June 5, 2012, the trial court entered a judgment of dismissal.

On July 23, 2012, Gidding filed a notice of appeal.

## DISCUSSION

### I. *General Legal Principles and Standard of Review*

Section 664.6 provides in relevant part: "If parties to pending litigation stipulate, in a writing signed by the parties outside the presence of the court or orally before the court, for settlement of the case, or part thereof, the court, upon motion, may enter judgment pursuant to the terms of the settlement. . . ."

"It is for the trial court to determine in the first instance whether the parties have entered into an enforceable settlement. [Citation.] In making that determination, 'the trial court acts as the trier of fact, determining whether the parties entered into a valid and

6

binding settlement. [Citation.] . . .' " "The trial court's factual findings on a motion to enforce a settlement pursuant to section 664.6 'are subject to limited appellate review and will not be disturbed if supported by substantial evidence.' [Citation.]" (*Osumi v. Sutton* (2007) 151 Cal.App.4th 1355, 1360.)

On questions of law, we review the trial court's ruling on a section 664.6 motion de novo. (*Sully-Miller Contracting Co. v. Gledson/Cashman Construction, Inc.* (2002) 103 Cal.App.4th 30, 35.) The trial court's threshold finding of ambiguity is such a question of law, "subject to our independent review. The court's ultimate construction of ambiguous language is subject to our independent review if the extrinsic evidence is not in conflict, even when the parties draw different inferences from the evidence. If the extrinsic evidence conflicts, we uphold any reasonable construction supported by substantial evidence. [Citation.]" (*Bill Signs Trucking, LLC v. Signs Family Limited Partnership* (2007) 157 Cal.App.4th 1515, 1521 (*Bill Signs Trucking*).)

## II. *Enforceability of the Settlement Agreement*

### A.

Gidding contends that, because the settlement agreement was ambiguous as to the need for the signatures of defendants' counsel, it must be interpreted in favor of his position that counsel's failure to sign the agreement before he repudiated it rendered it unenforceable. Defendants argue, on the contrary, that the agreement was not ambiguous and therefore did not require the use of extrinsic evidence to interpret its meaning.

"The fundamental goal of contract interpretation is to give effect to the mutual intention of the parties as it existed at the time they entered into the contract. ([See] Civ. Code, § 1636.) That intent is interpreted according to objective, rather than subjective, criteria. [Citation.] When the contract is clear and explicit, the parties' intent is determined solely by reference to the language of the agreement. (Civ. Code, §§ 1638 ['language of a contract is to govern its interpretation, if the language is clear and explicit, and does not involve an absurdity'], 1639 ['[w]hen a contract is reduced to writing, the intention of the parties is to be ascertained from the writing alone, if

7

possible'].) The words are to be understood 'in their ordinary and popular sense.' (Civ. Code, § 1644.)" (*Klein v. Chevron U.S.A., Inc.* (2012) 202 Cal.App.4th 1342, 1385.)

In the present case, we agree with defendants that the settlement agreement unambiguously demonstrates the parties' intention that only the signatures of the settling parties were required for the agreement to be enforceable. The agreement defines the settling parties as Gidding, Midshore, Salama, Schilt, and Tenax. The agreement contains three release clauses, which state that Gidding, Midshore, Salama, Schilt, and Tenax each agrees to release each other and American from liability. The agreement further provides that Schilt and Tenax will pay plaintiffs $100,000 and that Salama will pay plaintiffs $25,000. Although there are signature lines beneath the defendants' signature lines, under the caption, "Approved as to form," the attorneys for the settling defendants are not mentioned in the body of the agreement.

The California Supreme Court, in *Levy v. Superior Court* (1995) 10 Cal.4th 578, 585-586 (*Levy*), concluded that, under section 664.6, it is the litigants'—not their attorneys'—signatures that are necessary to make a settlement agreement enforceable. As the court explained: In enacting section 664.6, the Legislature "created a summary, expedited procedure to enforce settlement agreements when certain requirements that decrease the likelihood of misunderstandings are met. Thus the statute requires the 'parties' to stipulate in writing or orally before the court that they have settled the case. The litigants' direct participation tends to ensure that the settlement is the result of their mature reflection and deliberate assent." (*Levy,* at p. 585.) The court therefore found that the term "parties," as used in section 664.6, "means the litigants themselves, and does not include their attorneys of record," and held that a settlement agreement signed by the complainant's attorney, but not by the complainant, was not enforceable under section 664.6. (*Levy,* at p. 586, fn. omitted.)[3]

---

[3] In dictum, the appellate court in *Robertson v. Chen* (1996) 44 Cal.App.4th 1290, 1294 distinguished *Levy* from a situation involving an insurance-funded settlement, in which a settlement by an insurance carrier within policy limits does not prejudice the substantial rights of the insured. The appellate court did observe, however, that the

Here, because all of the parties to the litigation had signed the settlement agreement before Gidding repudiated it, the trial court properly ordered its enforcement. (See *Levy*, *supra*, 10 Cal.4th at pp. 585-586; § 664.6.)

In *Freedman v. Brutzkus* (2010) 182 Cal.App.4th 1065, 1067 (*Freedman*), the appellate court addressed whether an attorney's signature in a signature block of a contract, under the caption, "approved as to form and content," amounted to an actionable representation to the opposing party's attorney. The court held that the recital, "approved as to form and content," "indicates that an attorney has advised or is advising his or her own client of the attorney's approval of the document's form and content, and does not, by itself, operate as a representation to an opposing party's attorney that can provide a basis for tort liability." (*Id*. at p. 1067; cf. *In re Marriage of Hasso* (1991) 229 Cal.App.3d 1174, 1181 (*Hasso*) [attorney's approval as to form was not a condition precedent to enforceability of agreement].)

Likewise, in the present case, the signature of Layne or Ziser under the caption, "Approved as to form," would not have constituted an "actionable representation," but merely would have indicated that counsel had advised Schilt and Tenax of his approval of the document's form. (See *Freedman*, *supra*, 182 Cal.App.4th at p. 1067.)

The fact that Gidding is self-represented does not change this conclusion or somehow render the "approved as to form" signature line ambiguous. As our Supreme Court explained in *Rappleyea v. Campbell* (1994) 8 Cal.4th 975, 984-985: "[M]ere self-representation is not a ground for exceptionally lenient treatment. Except when a particular rule provides otherwise, the rules of civil procedure must apply equally to parties represented by counsel and those who forgo attorney representation. . . . A doctrine generally requiring or permitting exceptional treatment of parties who represent themselves would lead to a quagmire in the trial courts, and would be unfair to the other parties to litigation."

"rationale of *Levy* would apply to protect the insured in the professional liability context where the insured's consent is specifically required for settlement." (*Robertson,* at pp. 1294-1295, fn. 3.)

9

We conclude, as a matter of law, that the signatures of the parties were all that was necessary to make the settlement agreement enforceable. (See *Levy*, *supra*, 10 Cal.4th at pp. 585-586; *Freedman*, *supra*, 182 Cal.App.4th at p. 1070.)[4]

**B.**

Moreover, even assuming the settlement agreement were ambiguous, as Gidding asserts, we agree with the trial court that the extrinsic evidence demonstrates the parties' intent that the agreement did not have to be signed by defendants' counsel to be enforceable. (See *Bill Signs Trucking*, *supra*, 157 Cal.App.4th at p. 1521.)

In *Hasso*, *supra*, 229 Cal.App.3d at pages 1177-1178, a panel of this Division addressed an issue similar to the one presented here. In *Hasso*, the husband appealed from a judgment enforcing the terms of a marital settlement agreement that was signed only by himself and his wife, although both were represented by counsel. The agreement contained signature lines at the bottom for each of the parties' attorneys under the caption, " 'Approved as to Form.' " (*Id*. at p. 1178.) On appeal, the husband argued that "approval of the parties' respective attorneys was intended to be a precondition to enforceability of the . . . agreement." (*Id*. at p. 1180.)

We held that there was substantial evidence, both in the language of the document and the surrounding circumstances, to support the trial court's finding that attorney approval was not a condition precedent to enforceability of the agreement. (*Hasso*, *supra*, 229 Cal.App.3d at p. 1182.) As we explained, although the agreement had signature lines for "Approval *As To Form*" for each party's attorney, it nowhere stated that it was subject to review or content approval by the attorneys. Rather, it contained

---

[4] Although the trial court found the settlement agreement ambiguous, " '[w]e may affirm a trial court judgment on any [correct] basis presented by the record whether or not relied upon by the trial court. [Citation.]' [Citation.] 'No rule of decision is better or more firmly established by authority, nor one resting upon a sounder basis of reason and propriety, than that a ruling or decision, itself correct in law, will not be disturbed on appeal merely because given for a wrong reason. If right upon any theory of the law applicable to the case, it must be sustained regardless of the considerations which may have moved the trial court to its conclusion.' [Citation.]" (*ASP Properties Group, L.P. v. Fard, Inc.* (2005) 133 Cal.App.4th 1257, 1268.)

"acknowledgements by both parties that they had access to retained counsel prior to signing and were 'fully and completely informed as to the facts relating to the subject matter of this Agreement, and as to [their] rights and liabilities. . . .'" (*Id*. at p. 1181.)  We further stated that "[c]onditions precedent are not favored and contractual provisions will not be so construed in the absence of language plainly requiring such a construction. [Citation.]  There is no basis for such a construction here—the agreement contains no language that it is 'subject to' or 'conditioned on' attorney approval, and indeed has several paragraphs indicating an intent by the parties to enter into a binding accord regardless of their attorneys' advice." (*Ibid*.)

We therefore found that the language of the agreement did "not impose attorney approval as a condition precedent; at best, it raised an ambiguity on the issue which the trial court was entitled to resolve by considering not only the words used in the document, but the circumstances surrounding its execution.  [Citations.]" (*Hasso*, *supra*, 229 Cal.App.3d at p. 1181.)

We then found that the extrinsic evidence negated an inference that attorney approval was a condition precedent to the enforceability of the agreement.  (*Hasso*, *supra*, 229 Cal.App.3d at p. 1181.)  First, the parties had previously negotiated agreements without the assistance of attorneys and, second, after signing the agreement, "the parties immediately began to perform the agreement, without waiting for attorney approval." (*Ibid*.)

We also observed that there was evidence that lack of attorney approval was a "smoke screen to conceal [the husband's] true motive for repudiating the agreement," which involved the refusal of his daughters to consent to his "secret plan" regarding some of the property.  (*Hasso*, *supra*, 229 Cal.App.3d at pp. 1181-1182.)  Finally, we rejected the husband's argument that public policy concerns require courts to refrain from enforcing agreements entered into by parties without the consent of their retained counsel.  (*Id*. at p. 1182.)  We observed that the law favors settlements and could glean "no policy reason why Husband should be permitted to repudiate the agreement merely because his attorney's signature was not affixed." (*Id*. at p. 1185.)

11

In this case too, the agreement did not provide that it was subject to review or content approval by counsel. It also contains a provision stating that the settling parties had the opportunity to consult with counsel about the legal effect of the agreement and had freely entered into the agreement. The "Approved as to form" language thus does not impose attorney approval as a condition precedent. (See *Hasso*, *supra*, 229 Cal.App.3d at p. 1181.)

Furthermore, as in *Hasso*, the extrinsic evidence negates any inference that attorney approval was a condition precedent to the enforceability of the agreement. (See *Hasso*, *supra*, 229 Cal.App.3d at p. 1181.) The evidence included Gidding's responses to Ziser's notification regarding Goldenbrook's lien. After Ziser wrote, in an October 1, 2011 email, that he was uncertain about the effect the lien would have on the settlement, Gidding responded on October 2, that "the settlement was negotiated in good faith and settled, before the lien appeared." Then, on October 4, Gidding wrote in a follow-up email: "As both parties signed the Settlement agreement on and before September 21st, i.e., we have a deal. The lien, dated September 26th, came after the deal. I think you must send me the checks, post haste."

In its order granting defendants' motion for reconsideration, the trial court found that, at the time Gidding wrote in his October 4, email, "we have a deal," he "did not know and had not been told" that either Ziser or Layne had signed the agreement. Although Gidding claimed that he wrote the email "under the assumption" that Ziser or Layne had signed the agreement, no extrinsic evidence stated or even suggested that they had done so. The court therefore concluded: "If, as Gidding later claimed, it was critical to enforceability of the agreement that Ziser or Layne sign it, then it stands to reason that, before writing that 'we have a deal,' Gidding would have determined whether Ziser or Layne signed the agreement."

We reject Gidding's argument that his subjective intent—that everyone listed on the signature page of the agreement was required to sign it—should prevail. The trial court's interpretation of this evidence was reasonable and its conclusion that Gidding did not manifest an intent that the attorneys' signatures were necessary to the agreement's

12

enforceability finds support in the evidence.  (See *Bill Signs Trucking*, *supra*, 157 Cal.App.4th at p. 1521; cf. *Provost v. Regents of University of California* (2011) 201 Cal.App.4th 1289, 1300 [it is the parties' " 'objective and outward manifestations' " of mutual assent that control]; accord, *Klein v. Chevron U.S.A., Inc.*, *supra*, 202 Cal.App.4th at p. 1385.)

In addition, as in *Hasso*, there was some evidence that the lack of attorney approval was a "smoke screen" (*Hasso*, *supra*, 229 Cal.App.3d at p. 1181), and that Gidding's true motive for repudiating the agreement was quite different.  As Gidding wrote in his opening brief, "[w]hen Gidding accepted to [*sic*] settle his malpractice claim cheaply and quickly, his intention was to buy himself a settlement with Glendonbrook, and then return to the United States to live and work without a judgment hanging over his head" and without having to declare bankruptcy.  This motive was also reflected in the October 30, 2011 email in which he purported to repudiate the settlement agreement, and in which he wrote that he had intended to "use the settlement money to bargain with [Glendonbrook] rather than declare bankruptcy."

We likewise reject Gidding's assertion that, because any ambiguity regarding the agreement's meaning should be interpreted against the drafting party, his understanding of which signatures were required to make the agreement enforceable should prevail.  He relies on Civil Code section 1654, which provides:  " 'In cases of uncertainty not removed by the preceding rules, the language of a contract should be interpreted most strongly against the party who caused the uncertainty to exist.'  The rule contained in section 1654 'is to be used only when there is no extrinsic evidence available to aid in the interpretation of the contract or where the uncertainty cannot be remedied by other rules of interpretation.  [Citations.]  The rule does not stand for the proposition that, in every case where one of the parties to a contract points out a possible ambiguity, the interpretation favored by the nondrafting party will prevail.  The rule remains that the trier of fact will consider any available extrinsic evidence to determine what the parties actually intended the words of their contract to mean.  [Citation.]  Only in those instances where the extrinsic evidence is either lacking or is insufficient to resolve what the parties

13

intended the terms of the contract to mean will the rule that ambiguities are resolved against the drafter of the contract be applied. [Citation.]' [Citation.]" (*Steller v. Sears, Roebuck and Co.* (2010) 189 Cal.App.4th 175, 183-184; see also *County of San Joaquin v. Workers' Comp. Appeals Bd.* (2004) 117 Cal.App.4th 1180, 1186 ["a contract is not automatically construed against a drafter where, as here, the contract is the result of negotiations"]; compare *Mayhew v. Benninghoff* (1997) 53 Cal.App.4th 1365, 1370 [where agreement in question is between attorney and his or her client, "doctrine of *contra proferentem* (construing ambiguous agreements against the drafter) applies with even greater force when the person who prepared the writing is a lawyer"].)

Here, there was extrinsic evidence to aid in the interpretation of this agreement (see *Steller v. Sears, Roebuck and Co.*, *supra*, 189 Cal.App.4th at pp. 183-184), which was negotiated by both parties. (See *County of San Joaquin v. Workers' Comp. Appeals Bd.*, *supra*, 117 Cal.App.4th at p. 1186.) Nor does this matter involve a contract between an attorney and his or her client. (Compare *Mayhew v. Benninghoff*, *supra*, 53 Cal.App.4th at p. 1370.) Accordingly, it is not appropriate to interpret any ambiguity in the agreement against defendants.

In sum, the applicable law, the terms of the settlement agreement, and the extrinsic evidence all support the trial court's conclusion that attorney approval was not a condition for enforceability of the agreement. (See *Hasso*, *supra*, 229 Cal.App.3d at p. 1182.)

### III. *Alleged Fraud in the Inducement*

Gidding contends Layne and Ziser made false promises and representations that induced him to sign the agreement.

Specifically, Gidding argues that he was induced to sign the settlement agreement by the false representations in a September 14, 2011 email he received from Layne, in which Layne wrote, inter alia: "Attached please find a Confidential Settlement and Mutual General Release, plus a completed Request for Dismissal. My preference is always to have multiple wet ink originals of the settlement agreement, so everyone has an original signature by everyone else, but the agreement is drafted to correspond to the deal

14

made, i.e., faxed signatures = original." After directing Gidding to sign and date the agreement and return it to him, he further directed Gidding to "date and sign the request for dismissal and mail to me with your original signature; I will countersign and have [Salama's attorney] countersign (clerk will not dismiss case on the 'each side to bear their own costs and fees' terms unless all parties/counsel sign) and then hold the original without filing it until you have received both settlement checks and then I will file and serve Notice of Entry of Dismissal with endorsed filed copies to you and to [Salama's attorney]." (Bold omitted.)

According to Gidding, Layne and Ziser "breached their promises and representations in three distinct ways: (1) they did not sign the Agreement, (2) they did not send a copy of their signature page—whether unsigned, partially signed or signed—to Gidding, and (3) they concealed these facts from Gidding."

Defendants assert that Gidding first raised this argument in his motion for reconsideration in the trial court, and has therefore forfeited it by failing to raise it in his opposition to the motion to enforce the settlement agreement.

Even assuming the fraud argument is not forfeited, we find, nonetheless, that Gidding has not shown evidence of either a false promise or fraud in the inducement on the part of Layne or Ziser.

Fraud in the inducement "occurs when ' "the promisor knows what he is signing but his consent is *induced* by fraud, mutual assent is present and a contract is formed, which, by reason of the fraud, is *voidable*." ' " (*Rosenthal v. Great Western Fin. Securities Corp.* (1996) 14 Cal.4th 394, 415; see also Civ. Code, §§ 1567, 1572.)

Here, Gidding apparently misunderstood Layne's September 14, 2011 email, in which he wrote that defendants' counsel would sign the request for dismissal, *not* the settlement agreement. Moreover, Layne's statement regarding his preference for "multiple wet ink originals of the settlement agreement, so everyone has an original signature by everyone else," does not demonstrate a false representation by Layne that defendants' counsel would necessarily sign the agreement. Instead, this comment simply describes the method for obtaining the parties' signatures.

15

Accordingly, Gidding's claim that Layne and Ziser committed fraud in the inducement by failing "to honor their representations and promises, implicit and explicit," upon which he justifiably relied, is without merit.[5]

## DISPOSITION

The judgment of dismissal is affirmed. Costs on appeal are awarded to defendants.

_____
Kline, P.J.

We concur:

_____
Richman, J.

_____
Brick, J.*

* Judge of the Alameda County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

_____

[5] The present case is distinguishable from *Shafer v. Berger, Kahn, Shafton, Moss, Figler, Simon & Gladstone* (2003) 107 Cal.App.4th 54, 74-75, cited by Gidding, in which the plaintiffs claimed that an attorney for the defendant's insurance company initially told them that the defendant's insurance policy covered willful acts, but later claimed that willful acts were excluded. The appellate court held that the plaintiffs' complaint adequately pleaded that the attorney had made a fraudulent statement about their insurance coverage. (*Id*. at p. 75.) Here, as we have already discussed, there is no evidence that defendants' counsel made any false promise of material fact to Gidding.