[No. D047861. Fourth Dist., Div. One. Dec. 18, 2007.]

BILL SIGNS TRUCKING, LLC, et al., Plaintiffs and Appellants, v. SIGNS FAMILY LIMITED PARTNERSHIP et al., Defendants and Respondents.

1516

## COUNSEL

Lewis Brisbois Bisgaard & Smith, Roy G. Weatherup, Jeffry A. Miller; Eischen & Associates, James J. Eischen, Jr., and Robert P. Robinson for Plaintiffs and Appellants.

Law Offices of Jerry L. Carmody, Jerry L. Carmody; Fischbeck & Oberndorfer and William L. Fischbeck for Defendants and Respondents The Signs Family Limited Partnership, Lori Signs and L.A. Signs Investments, LLC.

Foster Walsh, George A. Foster and John Boyce, Jr., for Defendants and Respondents Tammy Duncan, T&B Signs27 LLC, Bill Signs Children's Trust, and Trishaydan, LLC.

**OPINION**

**McCONNELL, P. J.**—We hold in this case that a tenant's preemptive purchase rights under a commercial lease are not triggered by the conveyance of an interest in the property between copartners in a family limited partnership that owns the property and is the landlord. We affirm the judgment for defendants.

## FACTUAL AND PROCEDURAL BACKGROUND

William Signs, Jr., owned Bill Signs Trucking, Inc., later called Bill Signs Trucking, LLC (BST). Robert Neal began managing the business in 1985, with the understanding he would eventually obtain an ownership interest in it. Signs and Neal became close friends. Signs married Lori Signs in 1994.[1] His only child, Tammy Duncan, is from a former marriage. Lori was not on friendly grounds with Duncan or Neal.

In 1988 Signs purchased several parcels of land totaling approximately 45 acres on Channel Road in Lakeside, California. Signs and Neal began developing the parcels and BST moved its operation to approximately six acres of the property. Other portions of the property were used for other purposes.

In December 1992 Signs created the Signs Family Limited Partnership (SFLP) and transferred ownership of the Channel Road property to it, along with other real and personal property. Signs was the sole general partner in SFLP and he was originally the sole limited partner. His general interest was valued at 4 percent of the total value of the partnership and his limited interest was valued at 96 percent.

Also in December 1992 Signs created the William B. Signs, Jr. Children's Trust (Children's Trust) to benefit Duncan and her children. Signs conveyed 62 percent of his limited interest in SFLP to Duncan as trustee of the Children's Trust.

Shortly before their April 1994 marriage, Signs and Lori entered into a prenuptial agreement. It provided that on Signs's death, Lori was to receive 20 percent of his limited interest in SFLP and other assets.

In September 1994 Signs executed the William Boyd Signs, Jr. Trust (Signs Revocable Trust) and transferred his assets to it. Duncan and her children were beneficiaries on his death, and Lori was eligible to become a

---

[1] To avoid confusion we use Lori's first name.

beneficiary under the prenuptial agreement. Further, Signs's 4 percent general interest in SFLP and 51 percent of his interest in BST were to be distributed to Neal, and Neal was named first successor trustee.

In February 1999 Signs gave Neal a 20 percent interest in BST and they entered into an operating agreement for the business. Additionally, Signs and Lori amended their prenuptial agreement to give her 100 percent of his limited interest in SFLP on his death. Further, the agreement required Lori to cooperate to enable Neal to purchase the remainder of BST on Signs's death.

On April 26, 1999, SFLP and BST entered into a lease agreement (Lease) of the portion of the Channel Road property on which the business operates. The Lease contains preemptive purchase rights that are the subject of this appeal.

Section 1.03(a) of the Lease provides: "Landlord [SFLP] . . . agrees that it will not sell the Premises to any person until Landlord has given to Tenant [BST] notice in writing of its intent to sell, specifying the price and terms of the contemplated sale." Under section 1.03(a), BST had an option to purchase the property at the same price and on the same terms and conditions set forth in the notice of intent to sell.

Section 1.03(b) of the Lease provides: "If at any time during the term of this Lease Landlord receives from any third party a bona fide offer to purchase the Premises at a price and on terms acceptable to Landlord, Landlord shall give written notice of the offer to Tenant. Within thirty . . . days after Landlord gives Tenant written notice of the third-party offer, Tenant shall have the right to purchase the Premises at the same price and on the same terms and conditions set forth in the third-party offer."

Also on April 26, Signs amended the Signs Revocable Trust to remove Neal as first successor trustee and to designate Lori and Duncan as cotrustees, and to delete the bequests to Neal. Duncan was upset about sharing trustee duties with Lori, but Signs explained he wanted them to learn to get along, and "it would all work out" and "flow smoothly."

In November 1999 Signs amended SFLP in recognition of Neal's efforts to develop approximately 19.5 acres of additional land Signs purchased for a sand mining venture. This land is referred to separately as the East Willow property, but it is also included within the definition of the Channel Road property. The amendment stated SFLP "agrees to specially allocate and distribute 20% of net profits from such property [East Willow property] to . . . Neal. Net profits shall be defined as gross income from rents, royalties, licenses, environmental land bank credits[,] sale or other income producing uses of the property, net of expenses incurred in generating the gross income."

Signs died in January 2001, at which time he held general and limited interests in SFLP of 4 percent and 34 percent, respectively. Neal exercised an option to purchase Signs's interest in BST.

Lori and Duncan became embroiled in disputes and litigation regarding the management of SFLP and Duncan wanted out of the partnership.

Among the disagreements was the division of Signs's 4 percent general interest in SFLP. In October 2003, after mediation, Lori and Duncan approved the Signs Family Limited Partnership Distribution Agreement (SFLP Distribution Agreement), under which partnership assets are to be divided and it is to be dissolved. Duncan, for herself and the Children's Trust, is to receive 2 2/3 percent of the general interest (increasing her total interest to 64 2/3 percent), and Lori is to receive 1 1/3 percent of it (increasing her total interest to 35 1/3 percent). Additionally, Lori is to buy out Duncan's interest in the Channel Road property for $5 million.

SFLP sent Neal a letter notifying him of the SFLP Distribution Agreement and stating it believed the agreement did not trigger BST's preemptive purchase rights as to the portion of the property on which BST conducts business. Neal disagreed and he and BST sued SFLP, Lori, Duncan and the Children's Trust for specific performance and related counts.[2] Pending resolution of this litigation, the SFLP Distribution Agreement has not gone into effect.

The parties agreed to a bifurcated procedure, in which the trial court would first determine whether the proposed transfer triggered BST's preemptive purchase rights in the Lease and the special profit-sharing amendment to SFLP. The court found the Lease ambiguous and allowed parol evidence on Signs's intent. The court determined Signs did not intend that a transfer between family members would trigger Neal's preemptive purchase rights, and the proposed transaction was not a bona fide sale to a third party. The court denied Neal's claim for specific performance of the Lease, and also found the special profit-sharing amendment to SFLP was not triggered.

---

[2] BST also sued T&B Signs27, LLC, which Duncan owns; Trishaydan, LLC, which Duncan's children own; and LA Signs Investments, LLC, which Lori owns. Those limited liability corporations were formed in 2002, and under the SFLP Distribution Agreement, SFLP was to convey the Channel Road property to them, immediately after which Lori's corporation would buy out the interest of Duncan's corporations. For simplicity, when we discuss the proposed property transaction we do not refer to the corporations and instead refer to Lori and Duncan.

## DISCUSSION

### I

*Lease Interpretation/Standard of Review*

■ A lease agreement is subject to the general rules governing the interpretation of contracts. (*ASP Properties Group, L.P. v. Fard, Inc.* (2005) 133 Cal.App.4th 1257, 1269 [35 Cal.Rptr.3d 343] (*ASP*).) "A contract must be so interpreted as to give effect to the mutual intention of the parties as it existed at the time of contracting, so far as the same is ascertainable and lawful." (Civ. Code, § 1636.) When possible, the parties' mutual intention is to be determined solely from the language of the lease. "The 'clear and explicit' meaning of these provisions, interpreted in their 'ordinary and popular sense,' . . . controls judicial interpretation." (*ASP*, at p. 1269.) "Interpretation of a contract 'must be fair and reasonable, not leading to absurd conclusions. [Citation.]' " (*Ibid.*)

If a lease is ambiguous on its face, parol evidence is admissible to interpret it. (*Severns v. Union Pacific Railroad Co.* (2002) 101 Cal.App.4th 1209, 1214 [125 Cal.Rptr.2d 100].) Further, a lease is latently ambiguous if it appears clear on its face, but parol evidence shows it is reasonably susceptible to two or more interpretations. (*ASP, supra,* 133 Cal.App.4th at p. 1267.) In that instance, the " 'decision whether to admit parol [or extrinsic] evidence involves a two-step process. First, the court provisionally receives (without actually admitting) all credible evidence concerning the parties' intentions to determine "ambiguity," i.e., whether the language is "reasonably susceptible" to the interpretation urged by a party. If in light of the extrinsic evidence the court decides the language is "reasonably susceptible" to the interpretation urged, the extrinsic evidence is then admitted to aid in the second step— interpreting the contract.' " (*Ibid.*) "The test of admissibility of extrinsic evidence to explain the meaning of a written instrument is not whether it appears to the court to be plain and unambiguous on its face, but whether the offered evidence is relevant to prove a meaning to which the language of the instrument is reasonably susceptible." (*Pacific Gas & E. Co. v. G.W. Thomas Drayage etc. Co.* (1968) 69 Cal.2d 33, 37 [69 Cal.Rptr. 561, 442 P.2d 641].)

The trial court's threshold finding of ambiguity is a question of law subject to our independent review. The court's ultimate construction of ambiguous language is subject to our independent review if the extrinsic evidence is not in conflict, even when the parties draw different inferences from the evidence. If the extrinsic evidence conflicts, we uphold any reasonable construction supported by substantial evidence. (*ASP, supra,* 133 Cal.App.4th at pp. 1267–1268 & fn. 4.)

## II

### *Admission of Parol Evidence*

### A

BST's principal contention is that the court erred by adopting defendants' argument the Lease is ambiguous based on section 1.03(d), which provides the "transfer of Landlord's title to the Premises by will or intestacy shall not be deemed to be a sale under the provisions of this section." The court explained the Channel Road property was "transferred to Lori . . . and . . . Duncan pursuant to . . . Signs'[s] will and trust," and thus a transfer between them may not constitute a sale that would trigger BST's preemptive purchase rights. BST argued the term "any person" in section 1.03(a) is necessarily confined to parties other than third parties, because if it means third parties section 1.03(b), which expressly refers to third party offers, would be redundant. The court found both parties' interpretations plausible and admitted parol evidence as to Signs's intent.

BST contends section 1.03(d) of the Lease is inapplicable because the SFLP Distribution Agreement was drafted more than two years after Signs's death and the proposed transfer of property between Lori and Duncan is not a transfer by will. BST points out that "a decedent's property passes on the decedent's death to the person to whom it is devised in the decedent's last will." (Prob. Code, § 7000.)

We agree that section 1.03(d) of the Lease is inapplicable.[3] That does not mean, however, that reversal is warranted. " 'No rule o[r] decision is better or more firmly established by authority, nor one resting upon a sounder basis of reason and propriety, than that a ruling or decision, itself correct in law, will not be disturbed on appeal merely because given for a wrong reason. If right upon any theory of the law applicable to the case, it must be sustained regardless of the considerations which may have moved the trial court to its conclusion.' " (*ASP, supra*, 133 Cal.App.4th at p. 1268.)

### B

■ A preemptive purchase right is a grant from a landowner that gives the grantee the first opportunity to purchase the property if the landowner decides to sell. (Greenwald & Asimow, Cal. Practice Guide: Real Property (The Rutter Group 2007) ¶ 8:200, p. 8-40 (hereafter Greenwald & Asimow).)

---

[3] We note the court's ultimate construction of the Lease was not based on section 1.03(d).

A preemptive purchase right takes one of two forms, a "right of first refusal" or a "right of first offer." (*Id.,* ¶ 8:204, p. 8-40.)

"Under a 'right of first refusal,' the landowner seller first procures an offer to purchase from a third party on terms and conditions acceptable to the seller. The seller must then present the third party offer to the grantee of the right of first refusal who, in turn, has a limited period . . . to either *match* the offer or reject it." (Greenwald & Asimow, *supra,* ¶ 8:206, p. 8-41.) A right of first refusal "does not become an option to purchase until the owner of the property voluntarily decides to sell the property and receives a bona fide offer to purchase it from a third party." (*Campbell v. Alger* (1999) 71 Cal.App.4th 200, 206–207 [83 Cal.Rptr.2d 696].)

"Because rights of first refusal can adversely affect an owner's ability to market its property . . . , a preemptive purchase right often takes the form of a 'right of first offer.' Here, the seller, upon deciding to market its property, must first make an offer to the grantee of the right of first offer. If the grantee does not accept that offer, the seller is then free to sell to anyone else on the terms rejected by the grantee or on terms which are better—but not worse— for the seller; in other words, no other buyer can get a better deal than that which was presented to the grantee." (Greenwald & Asimow, *supra,* ¶ 8:208, p. 8-42.)

It appears that a lease would ordinarily not contain both a right of first offer and a right of first refusal. "The advantage of using a right of first offer *rather than a right of first refusal* is that once the grantee has rejected the seller's offer, the seller is free to proceed with a sale to another buyer without having to go back to the grantee (provided the sale is on terms no better than those offered to the grantee). Also, once the grantee elects not to accept the seller's offer, brokers are more willing to undertake a listing of the property. [¶] On the other hand, the seller will (at least theoretically) have to present to the grantee its 'rock-bottom' price (and best terms), since the seller will not be able to accept any price lower than that offered to the grantee." (Greenwald & Asimow, *supra,* at ¶ 8:209, pp. 8-42 to 8-42.1, italics added.)

Here, however, the Lease contains both a right of first offer (section 1.03(a)) and a right of first refusal (section 1.03(b)). Contrary to BST's position, the provisions are not merely alternative ways of stating a right of first refusal. The two sections have different purposes and criteria, and section 1.03(a) may be interpreted to apply only to offers from the landlord *to* third parties, without rendering redundant section 1.03(b), which applies to offers *from* third parties to the landlord. Contrary to BST's view, interpreting section 1.03(a) to refer to third parties does not render section 1.03(b) surplusage.

Additionally, BST concentrates on the "any persons" language in section 1.03(a) and virtually ignores that it is the *landlord* who agrees not to sell to "any persons" without first offering the property to BST on like terms. The term "any persons" logically refers to parties other than the landlord. Under BST's interpretation, section 1.03(a) would essentially read: "Landlord [SFLP] . . . agrees that it will not sell the Premises to any person [SFLP] until Landlord [SFLP] has given to Tenant [BST] notice in writing of its intent to sell, specifying the price and terms of the contemplated sale."

Although perhaps the Lease could be interpreted as a matter of law, albeit against BST, we cannot fault the court for allowing parol evidence to explain the "any persons" language in section 1.03(a). The court gave BST the benefit of the doubt by finding section 1.03(a) was reasonably susceptible to its interpretation. The section is also reasonably susceptible to the interpretation that "any persons" refers exclusively to third parties, and not to co-owners of SFLP.

BST also asserts that since the Lease contains an integration clause, parol evidence was inadmissible. Section 10.07 of the Lease provides: "This instrument constitutes the sole and only agreement between Landlord and Tenant respecting the Premises, the leasing of the Premises to Tenant, and the Lease terms contained in this Lease, and correctly sets forth the obligations of Landlord and Tenant to each other as of its date. Any agreements or representations respecting the Premises or their leasing by Landlord to Tenant not expressly set forth in this instrument are null and void."

BST cites Code of Civil Procedure section 1856, subdivision (a), under which "[t]erms set forth in a writing intended by the parties as a final expression of their agreement with respect to such terms as are included therein may not be contradicted by evidence of any prior agreement or of a contemporaneous oral agreement." The statute is inapplicable as the parol evidence here was introduced to explain the language of section 1.03(a) of the Lease, and not to add to or vary the terms of the Lease.

### III

### *Section 1.03(a) of the Lease/Signs's Intent*

BST agrees the parol evidence is not in conflict and thus presents a question of law for our independent review.

Lawrence Faas, a certified public accountant, began doing estate planning and tax work for Signs in the mid-1980's. Faas testified that Signs told him he wanted the Channel Road property to remain in the family, and for Lori

and Duncan "to benefit from the income from that real estate." Further, Faas testified the property "was always intended to be a long-term hold, whether . . . Signs held it or whether the family held it, it was expected that it would take a long period . . . before it was sold."

Dale Mills, an attorney, represented Signs for more than 20 years. Mills prepared the Lease. When asked about Signs's input on the Lease, Mills testified that "Signs was concerned about the continuation of business operations for his trucking company. He was very proud of his trucking company. That was one of the legacies of his life. . . . He wanted to make sure that . . . Neal would be able to continue operating the trucking company at that physical location, without having fear of a new landlord coming into the picture that might oust him or cause him problems in the operation of the trucking business. So the part regarding the first refusal rights was something that . . . Signs was quite concerned with."

BST did not offer any evidence to dispute Faas's or Mills's testimony, and it adequately establishes that while Signs valued his professional and personal relationships with Neal, he intended that ownership of the Channel Road property remain in the family as long as possible.

Further, Signs's estate planning documents confirm this intent. They show that several years before Signs executed the Lease, he conveyed 62 percent of his limited interest in SFLP to Duncan. Under BST's interpretation of section 1.03(a), even during Signs's lifetime SFLP could not have offered to purchase Duncan's interest in the Channel Road property without triggering BST's right of first offer. Surely Signs, who made frequent changes to his estate planning documents, did not intend that possibility.

Additionally, when Signs executed the Lease he knew his wife and daughter did not get along, and a reasonable inference arises that he realized that after his death they might choose to dissolve their partnership. He wished for cooperation between them, but we believe he would not have wanted Duncan's decision to get out of the family business to give BST a superior right to purchase her interest in the property. Accordingly, we interpret the term "any persons" in section 1.03(a) to mean third parties.

IV

*Third Party Sale*

In ruling that the proposed transfer here did not trigger BST's preemptive purchase rights, the court relied on *Pellandini v. Valadao* (2003) 113

Cal.App.4th 1315 [7 Cal.Rptr.3d 413] (*Pellandini*). In *Pellandini,* a grandfather devised three parcels of land to his grandson, James Pellandini, and one-half of a fourth parcel to Pellandini and the remainder of it to Pellandini's cousins, Suzanne Wooldridge and Cathryn Valadao. The parties were involved in a series of court actions and they agreed to the creation by partition of "a new parcel equivalent to the interests of Wooldridge and Valadao in the fourth parcel," which they would own as tenants in common. (*Id.* at p. 1317.) For paying the costs of partition, Pellandini was allowed to farm parcel four during the current crop season. The agreement provided he " 'will waive his right of first refusal on the property owned by [Wooldridge] and [Valadao] as granted in the trust . . . . [¶] [Wooldridge] and [Valadao] will, however, give . . . Pellandini a right of first refusal to meet any bona fide offer for purchase of the property.' "

After recordation of the deed to the new parcel, Wooldridge conveyed her interest in it to herself and her husband as community property. Additionally, she and her husband signed a promissory note in favor of Valadao for $163,000, which was secured by a deed of trust on their interest in the new parcel. After Wooldridge and her husband defaulted on monthly payments, they gave Valadao a deed in lieu of foreclosure. When Pellandini learned of it, he demanded the opportunity to purchase Woolridge's interest in the new parcel for the same consideration as Valadao paid, but she refused. (*Pellandini, supra,* 113 Cal.App.4th at pp. 1317–1318.)

Pellandini sued for specific enforcement of the right of first refusal contained in the settlement agreement. The trial court granted Pellandini's motion for summary adjudication on the ground "Wooldridge's decision to sign a deed in lieu of foreclosure was a voluntary act triggering Pellandini's right of first refusal. The court's decision was also based on the view that any party could easily nullify a right of first refusal by orchestrating a sham loan, default, and deed in lieu of foreclosure transaction." (*Pellandini, supra,* 113 Cal.App.4th at p. 1319.)

██ The Court of Appeal reversed the summary adjudication, holding as a matter of first impression in California that the sale of property between co-owners did not trigger a first right of refusal because there was no bona fide sale to a third party. (*Pellandini, supra,* 113 Cal.App.4th at p. 1319.) The court relied on several cases from other jurisdictions (*Prince v. Elm Inv. Co., Inc.* (Utah 1982) 649 P.2d 820; *Baker v. McCarthy* (1982) 122 N.H. 171 [443 A.2d 138]; *Koella v. McHargue* (Tenn.Ct.App. 1998) 976 S.W.2d 658; *Byron Material, Inc. v. Ashelford* (1975) 34 Ill.App.3d 301 [339 N.E.2d 26]; *Wilson v. Grey* (Ky. 1978) 560 S.W.2d 561; *Rogers v. Neiman* (1971) 187 Neb. 582 [193 N.W.2d 266]), and concluded "[t]wo separate rationales emerge from [them]. A bona fide sale occurs when the entire interest in the property

is sold. A bona fide sale occurs when an interest in the property is sold to a third party." (*Pellandini, supra*, 113 Cal.App.4th at p. 1322.) The court also noted "Pellandini loses nothing by a transfer between Wooldridge and Valadao. Such a transfer does no harm to Pellandini's interest, and his right of first refusal remains intact." (*Ibid.*)

BST attempts to distinguish *Pellandini* on the ground that here, section 1.03(a) of the Lease does not require a bona fide sale to a third party. As discussed, however, we have concluded section 1.03(a) applies only to offers of sale made to third parties.

BST also asserts *Pellandini* is inapplicable because the right of first refusal there was given by co-owners of the property, and here neither Lori nor Duncan was a party to the Lease when the right of first refusal was created. When they approved the SFLP Distribution Agreement, however, they were partners in SFLP, and thus co-owners of SFLP and colandlords under the Lease. In *Prince v. Elm Inv. Co., supra*, 649 P.2d at page 823, the court explained that "for purposes of a right of first refusal, a 'sale' occurs upon the transfer (a) for value (b) of a significant interest in the subject property (c) to a stranger to the lease, (d) who thereby gains substantial control over the leased property." Lori is not a stranger to the Lease, but rather already has control over it through SFLP.

*Wilson v. Grey, supra*, 560 S.W.2d 561, is also instructive. The lease there provided: " 'Should lessor ever desire to sell the leased premises lessees are given the right to purchase the same at the price which lessor has been offered for the premises.' " (*Ibid.*) The lessor died and left the property to her two sons Paul and Philip, and former daughter-in-law Iness. When Philip sold his interest to Paul, the lessee sued for specific performance of the right of first refusal. The court concluded the transfer did not trigger the right, explaining: "When the lease was executed there was but one 'lessor.' Obviously a 'sale' could have been made only to a person or persons other than that lessor. When she died[,] Paul, Philip and Iness became the collective 'lessor,' and the sale of Philip's share to Paul was not a sale to a person other than the lessor. The transfer did not place any of the landlord's reversionary interest outside the ownership of the existing 'lessor.' " (*Id.* at p. 562.) The court held "that in the absence of introducing a new party as one of the lessors there was no sale by the 'lessor' under the terms of this lease." (*Ibid.*)

Here, there is also one lessor, SFLP, and the term "Landlord" in sections 1.03(a) and 1.03(b) of the Lease logically includes all partners in SFLP. BST neither loses nor gains through the proposed transfer, and its preemptive purchase rights continue in the event of an actual third party offer. For instance, if the contemplated transaction between Lori and Duncan goes

through, and Lori ultimately sells the property to a third party, BST's rights of first offer and first refusal would be triggered. The co-owner analysis of *Pellandini* and cases cited therein applies with equal force here.

Additionally, BST contends the proposed transaction here is a bona fide sale to a third party, as Lori and Duncan "negotiated a series of arms-length transactions, agreed to a price for the sale of the real property, and intended a full transfer of . . . Duncan's real property rights in the Channel Road Properties to . . . Lori." BST also cites Duncan's testimony that for tax purposes she intended to exchange the sale proceeds for like kind property under section 1031 of the Internal Revenue Code. We must, however, "look beyond the formalities and accounting entries to the true nature of the conveyance." (*Creque v. Texaco Antilles Ltd.* (3d Cir. 2005) 409 F.3d 150, 154, citing *Isaacson v. First Security Bank of Utah* (1973) 95 Idaho 452 [511 P.2d 269].) "Only when the conveyance is marked by arms' length dealing *and* a change in control of the property may that right be exercised." (*Creque, supra*, at p. 155, italics added.) Here, the proposed transfer adjusts the interests of co-owners, but does not introduce any new party with control over the Lease. (See *Prince v. Elm Inv. Co., Inc., supra*, 649 P.2d at pp. 822–823.)

 We conclude that Lori's proposed purchase of Duncan's interest in the portion of the Channel Road property subject to the Lease does not trigger either section 1.03(a) or 1.03(b) of the Lease. The Lease intends a sale to a third party by all partners of SFLP, and does not intend to make BST a co-owner of the property with one of the partners. (See *Baker v. McCarthy, supra*, 443 A.2d at p. 141.) Accordingly, the court properly denied BST's claim for specific performance.[4]

V

*Special Profit Interest in East Willow Property*

BST additionally contends the court erred by finding the proposed transaction between Lori and Duncan did not trigger Neal's special profit interest in the East Willow property, as set forth in the November 1999 amendment to SFLP. BST's only theory, however, is that if we reverse the judgment on the preemptive purchase rights issue, we must also reverse the judgment on the special profit interest issue. Accordingly, we affirm the judgment on all grounds.

---

[4] Given our holding, we are not required to reach the parties' contentions regarding whether the term "Premises" in sections 1.03(a) and 1.03(b) of the Lease includes a partial interest in the property.

## DISPOSITION

The judgment is affirmed. Defendants are entitled to costs on appeal from plaintiffs.

McIntyre, J., and Irion, J., concurred.

A petition for a rehearing was denied January 14, 2008, and appellants' petition for review by the Supreme Court was denied April 9, 2008, S160396.