Filed 12/22/14  Schmidbauer v. Deelo CA2/7

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| WENDY SCHMIDBAUER, | B248349 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. SC110602) |
| v. | |
| CHRISTINE RENEE DEELO, et al. | |
| Defendants and Appellants. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Cesar Sarmiento, Judge.  Affirmed.

Anderson, McPharlin & Conners, Michael S. Robinson and Lisa Ann Coe, for Plaintiff and Respondent.

Alan G. Novodor and the Law Offices of Alan G. Novodor, for Defendants and Appellants.

_____

Wendy Schmidbauer filed a complaint against Christine and Michael Deelo seeking to quiet title to a condominium development stairway that provided access to an underground parking structure. Schmidbauer argued that the condominium plan's floor diagram showed the stairway was located in an area designated as her private patio space. The Deelos, however, argued that the condominium plan and other documents made clear that all stairways within the development were intended to be common areas. The trial court found the documents were ambiguous and admitted extrinsic evidence to aid in their interpretation. After a bench trial, the court entered judgment in favor of Schmidbauer. We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

### A. *Description of the Condominium Development*

The Blue Pacific is a three-story condominium development that contains eight individual units and an underground parking structure. The development is located on the southern side of Pacific Street with the front side of the building facing northward. Units one through three are located on the first floor; the remaining six units are located on floors two and three. The three first floor units run the width of the building from east to west, with their front doors opening onto the west side of the building. Unit one is located in the front (northern) third of the building, unit three is located in the rear (southern) third of the building and unit two is located in the middle third of the building, positioned between units one and three.

All of the first floor units have private patio areas. Units one and two each have two patio areas: a small patio located next to each unit's front door on the west side of the building and a larger patio located behind the unit that extends from its eastern exterior wall to the development's eastern property boundary. Unit three, which is in the rear of the building, has a u-shaped patio area that wraps around the southern third of the building, extending from unit three's exterior walls to the western, southern and eastern property boundaries.

2

The development is accessible from Pacific Street through two common doorways on the front side of the property. The first common doorway opens onto a common pathway that runs along the western side of the building, past the front doors of units one and two. The pathway ends at a wooden gate that is located at the boundary of unit three's western patio area. The second common doorway is on the east side of the building and opens onto a multi-level wooden stairway that runs from the first floor to the third floor, providing access to the upper level units. This stairway is attached to the northeast corner of the building. The development also contains an elevator in the southeast corner of the building that runs from the parking structure to the second and third floors; the elevator does not stop on the first floor. A second multi-level wooden stairway is positioned next to the elevator, which runs from the first floor to the third floor.

The development's underground parking structure has a vehicular garage door that opens onto Pacific Street and a pedestrian doorway located next to the garage door. There is a stairway at the back (southern end) of the parking structure that runs diagonally, east to west, up the back wall of the building and opens into unit three's patio area near unit three's front door. Based on the design of the development, units on the upper levels have different access to the parking structure than units on the first floor. Tenants in the upper-level units can access the parking structure by using the elevator in the southeast corner of the building. Alternatively, the upper-level tenants can walk down the multi-level stairway at the northeast corner of the building, walk out the common doorway on the east side of the building, and then travel along the front of the building and access the parking structure through its pedestrian doorway.

Tenants on the first floor units, which open on to the west side of the building, can walk northward along the common path on the west side of the development, exit through the western common doorway on to Pacific Street, and then follow the sidewalk down to the parking structure's pedestrian doorway. Alternatively, tenants on the first floor can access the parking structure by walking southward along the western common path,

entering into unit three's patio area and accessing the stairway that leads down to the back of the parking structure (the garage stairway).

### B. The Parties' Dispute Regarding Use of the Garage Stairway

In 2001, defendant and appellant Christine Renee Deelo (Deelo) purchased unit two. At the time of her purchase, unit three was owned by Richard Rudolph. When Rudolph owned unit three, Deelo normally accessed the parking structure by traveling south along the western common path, entering unit three's patio area and walking down the garage stairway. On some occasions, however, Deelo would access the parking structure by traveling north along the pathway, exiting through the common doorway onto Pacific Street, and then entering the structure through its pedestrian doorway. Deelo preferred to use the garage stairway to access the parking structure because she thought it was safer and more convenient than walking outside the front of the building.[1]

In 2003, plaintiff and respondent Wendy Schmidbauer purchased unit three from Rudolph. Shortly after the purchase, Schmidbauer informed the building tenants that a floor diagram in the condominium plan showed that the garage stairway was located in unit three's patio space and was therefore excluded from the development's common area. Schmidbauer requested that all occupants stop using the stairway to enter or exit the parking structure. Deelo, however, continued to use the stairway.[2]

In 2006, Deelo got married and her husband, Michael Deelo, moved into unit two. The Deelos eventually had two children. In 2010, Schmidbauer informed the Deelos that their increased use of the garage stairway was impinging on her privacy and requested

---

[1] At trial, Rudolph and Deelo provided conflicting testimony as to whether Rudolph had provided Deelo permission to access his patio area and the garage stairway. Deelo testified that although Rudolph had told her not to use the garage stairway, she had informed him it was a common area accessible to all tenants. Rudolph, however, testified that he had permitted Deelo to use the garage stairway when there was inclement weather or when she returned to her condominium late at night.

[2] At trial, Schmidbauer testified that she gave Deelo permission to continue using the stairway because Deelo was a young, single female. Deelo, however, testified that she had continued to use the stairway over Schmidbauer's objection.

4

that they stop using it.  The Deelos refused, asserting that the stairway was part of the common area of the development.

### C. *Summary of the Parties' Pleadings and the Condominium Development's Governing Documents*

#### 1. *The parties' complaints*

In December of 2010, Schmidbauer filed a complaint seeking to quiet title to the garage stairway and for a declaratory judgment prohibiting the Deelos or any other building occupants from entering unit three's patio area to access the garage stairway. The complaint alleged that the condominium plan's floor diagram showed the garage stairway was not common area, but rather was part of unit three's patio.

The Deelos filed cross-complaint seeking to quiet title to the garage stairway and an easement over the portion of unit three's patio area that lead to the stairway.  The Deelos's cross-complaint asserted that language in the condominium plan and the development's "Declaration of Restrictions" made clear that all stairways within the development were common areas and that every separate interest was subject to easements for ingress and egress to common areas.  Alternatively, the cross-complaint asserted a prescriptive easement over unit three's patio space and the garage stairway based on the Deelos's prior use.[3]

#### 2. *The condominium development's governing documents*

The parties' cross-complaints were predicated on their conflicting interpretations of two governing documents that the original owner of the development had recorded pursuant to state laws governing common interest developments:  the "Condominium Plan" and the "Declaration of Restrictions."[4]  (See former Civil Code, § 1352; current

---

[3]     The Deelos's cross-complaint raised additional claims against Schmidbauer and other defendants that are not relevant to this appeal.

[4]     At the time the Blue Pacific was constructed in 1975, it was governed by the Condominium Act, former Civil Code sections 1350 *et seq.*  (See Witkin, Summary of Cal. Law (10th ed. 2005) Real Property, § 85, p. 134-135 (Witkin) [historical summary

5

§ 4200 [common interest development is created when "separate interest coupled with an interest in the common area . . . is, or has been, conveyed" and "all of the following are recorded:" (1) "A declaration"; (2) "A condominium plan, if any exists"; and (3) a final map or parcel map, if one is required under the Government Code].)

### a. The Condominium Plan[5]

The Condominium Plan (the Plan) consists of a "diagrammatic floor plan of the building" (floor diagram) and a list of "Notes and Definitions" (Notes) that clarifies aspects of the floor diagram.

The Plan's Notes state that the "common area of the project" includes all areas within the lines of the project "except units 1 through 8" as depicted on the floor diagram. The Notes explain that each "unit" consists of "all those elements [on the floor diagram] bearing" the unit's number. Different "elements" of the unit are assigned different letters: areas marked "A" designate the units's "dwelling area"; areas marked "C" or "D" designate the units's "balconies and patios." Thus, for example, any area marked "3C" denotes unit three's separately held patio area. Note six, however, excludes the following

---

of statutes governing condominiums and other common interest developments].) In 1985, the Condominium Act was repealed and replaced by the Davis-Stirling Common Interest Development Act. (See *Thaler v. Household Finance Corp*. (2000) 80 Cal.App.4th 1093, 1101; Witkin, *supra*, Real Property, § 314, p. 134.) Effective January 1, 2014, the Davis-Stirling Act was "repealed, reenacted and renumbered" as §§ 4000 *et seq*. (*Seahaus La Jolla Owners Assn. v. Superior Court* (2014) 224 Cal.App.4th 754, 760, fn. 1.) This appeal does not does not involve any dispute regarding the statutory requirements governing common interest developments. The sole issue is whether the trial court properly interpreted the condominium development's governing documents. In their appellate briefs, the parties cite to provisions of the Davis-Stirling Act, rather than the former Condominium Act. For purposes of simplicity, we do the same. Unless otherwise noted, all further statutory citations are to the Civil Code.

[5] Under the Davis-Stirling Act, a condominium plan generally has three elements: (1) "A description or survey map of a condominium project, which shall refer to or show monumentation on the ground; (2) "A three-dimensional description of a condominium project . . . in sufficient detail to identify the common area and each separate interest"; and (3) a certificate consenting to the recordation of the condominium plan. (See former § 1351, subd. (e); current §§ 4285, 4290.)

items from each unit: "bearing walls, columns, floors, roofs, slabs, foundations, balcony and patio structures, common stairways and hallways . . . ."

The floor diagram of the first floor, attached as an appendix to this opinion, shows a large rectangle designating the development's property boundaries. Within this rectangle, there are three similarly-sized smaller rectangles labeled as areas 1A, 2A and 3A, designating the floor-level units's dwelling areas. The diagram shows a common area running along the entire northern border (the front side) of the development where the sidewalks and access ramp to the parking structure are located. The diagram shows another common area running along the northern two-thirds of the western border of the development, which represents the western common pathway that passes the front doors of units one and two, ending at the boundary of unit three's western patio area. There are two small spaces blocked out from the western common pathway marked "1D" and "2D," which depict unit one and unit two's western patio areas.

Along the eastern border of the development, the floor diagram shows unit one and unit two's eastern patios (marked "1C" and "2C"), which extend from each units's eastern exterior wall to the eastern property boundary. Area 1C contains a blocked out section (representing common area) in the location of the multi-level wooden stairway on the northeast corner of the building.

The floor diagram also shows unit three's u-shaped patio (area "3C"), which wraps around the entire rear of the building. On the west side of the development, the 3C patio area begins at the end of the western common pathway and extends to the southern property boundary; on the eastern side of the development, the patio borders unit two's eastern patio and extends to the southern property boundary; on the southern side of the development, the patio extends from unit three's exterior southern wall to the southern property boundary. The eastern side of area 3C contains a blocked out section in the location of the elevator and the exterior multi-level wooden stairway that runs adjacent to the elevator. Area 3C does not have a blocked out section in the area where the garage stairway is located.

7

### b. The Declaration of Restrictions

The Declaration of Restrictions (DOR)[6] sets forth a "plan for the ownership of the units and common area within the development."  The DOR, which incorporates the Condominium Plan, contains a description of the project stating that each unit "designated on the . . . Plan" constitutes "a separate freehold estate consisting of the dwelling space and any accompanying balcony or patio space."  The DOR defines the term "common areas" to include the "remaining portion of the project."  As with the Plan, the DOR includes a list of items that are excluded from each unit, which includes "bearing walls, columns, floors, slabs, foundations, storage spaces, balcony structures, . . . elevators, stairways. . . ."  Thus, although both the DOR and the Plan exclude "stairways" from the definition of a unit, the Plan states that "common stairways" are excluded while the DOR states only that "stairways" are excluded.

The DOR further provides that "[i]f any portion of the common areas encroach upon the units, a valid easement for the encroachment and for the maintenance of same, . . . shall and does exist. . . Common areas shall always be subject to easements for minor encroachments thereon of the unit; and a non-exclusive easement for ingress and egress and support are subject to such easements."

Finally, the DOR includes a provision describing "restricted common area," which is defined as a portion of the common area "set aside . . . for the restricted use of respective units."  Only the individual parking spaces located within the parking structure are identified as "restricted common area."

---

[6]    A common interest development "declaration" is required to include "a legal description of the common interest development" and "the restrictions on the use or enjoyment of any portion of the common interest development that are intended to be enforceable equitable servitudes."  The declaration may also contain "any other matters the declarant or the members consider appropriate."  (See former §§ 1351, subd. (h), 1353; current §§ 4135, 4250.)

## D. Trial Court Proceedings

### 1. The Deelos's motion for summary judgment

In October of 2011, the Deelos moved for summary judgment, arguing that the governing documents unambiguously demonstrated that the garage stairway and "walkway in [unit three's patio] . . . leading to the top of the [garage] stairway" were common areas. In support, the Deelos cited the provisions in the DOR stating that "stairways" were not part of any unit and that an easement existed over any part of a unit that was encroached upon by a common area. They also cited the language in the Plan stating that "common stairways and hallways" were not part of any unit. The Deelos argued this language made clear that although the garage stairway was located within unit three's patio area, the stairway was nonetheless part of the development's common area and therefore freely accessible to all tenants.

The Deelos acknowledged the Plan's floor diagram did not include any designation within area 3C (unit three's patio) showing that the garage stairway was actually common area. They argued, however, that the "diagram ha[d] no legal effect" because the DOR and the Plan both included express language clarifying that: (1) "stairways" were not part of a unit; and (2) any area that was not part of a unit qualified as common area.

Schmidbauer, however, argued that if the original owner of the development had intended the garage stairway to be common area, the floor diagram would have shown that area blocked out from unit three's patio space. In support of this argument, Schmidbauer noted that the floor diagram did block out other common areas from the units's patio spaces, including the elevator and adjacent multi-level staircase (blocked out from unit three's patio) and the multi-level wooden stairway located at the front of the building (blocked out from unit one's eastern patio). Schmidbauer also argued that, contrary to the Deelos's assertions, the DOR and Plan did not exclude all "stairways" from the definition of the unit. Rather, the Plan, incorporated by reference into the DOR, stated that "common stairways" were not part of any unit. According to Schmidbauer,

9

the term "common stairways" was only intended to refer to stairways located in areas that were designated as common area on the floor diagram.

Schmidbauer filed several pieces of evidence in support of her opposition, including a personal declaration describing the layout of the development, numerous photographs of the development and an expert declaration from David Knell, a professional surveyor who had prepared numerous condominium plans. Knell's declaration stated that, based on his knowledge and experience, the floor diagram would have shown the garage stairway blocked out of unit three's patio area if it was intended to be common area. Knell also stated that if the stairway was intended to be common area, he would expect to see a "corridor" blocked out of unit three's patio area connecting the stairway to the western common pathway. Knell concluded that because there was no "visual representation or provision in the Condominium Plan address[ing] the parking garage stairs as being common area," the stairs were likely intended to be "used in emergency situations only."

The court denied the Deelos's motion for motion for summary judgment, concluding that they had "failed to establish, as a matter of law, that the [governing documents] unambiguously make[s] the disputed area 'common area'" and that Schmidbauer's evidence demonstrated there were "triable issues of material fact as to whether the subject area is a common area."

### 2. Bench trial

#### a. Summary of evidence at trial

During the bench trial, the parties relied on extrinsic evidence to aid the court in the interpretation of the DOR and the Plan. First, the parties invited the court to conduct a visual inspection of the property. (See *City and County of San Francisco v. Meyer* (1962) 208 Cal.App.2d 125, 130 ["the trial judge's view of the property 'with the consent of counsel is evidence in the case'"].) According to the court's statements at trial, it had visited the property with counsel and spent 20 to 30 minutes examining "the entire condominium project," including all the "accessways . . . and the stairways."

10

Second, the parties introduced several photographs of the development. Photographs of the front side of the development (the north side) showed the common doorways on the east and west side of the building that open onto Pacific Street and provide access to sidewalk areas that lead to the parking structure's pedestrian doorway. Photographs of the western side of the development showed the common pathway that runs past the front doors of units one and two and ends at a wooden gate at the boundary of unit three's western patio area. Several other photographs showed unit three's patio area and the disputed garage stairway, which is positioned next to unit three's front door.

Third, David Knell provided expert testimony regarding condominium plan diagrams. Knell stated that he had personally prepared approximately 70 condominium plans and was frequently retained by title companies to review condominium plans prepared by third parties. Knell testified that, under industry standards and practices, any area within a condominium development floor diagram that is not designated as part of a separate interest is generally common area. Knell also explained that if a common area is located within a separate interest area, surveyors will normally "block[] out" the common area from the separate interest.

Knell testified that when preparing condominium plans, he would generally mark any stairway that was intended for "everyday use" as "common area" by either placing a box denoted "common area" where the stairway was located or by making a separate note in the declaration of restrictions. Knell further testified that if a stairway that opened into a separate interest area was intended to be common area, the standard practice would be to "depict a route through the separate interest to join [the stairway] to a common area." Knell further stated that the floor diagram at issue here did not include any markings indicating that the garage stairway was meant to be "common area," nor did it depict a route through unit three's patio connecting the stairway to a common pathway. Knell also noted that the diagram did block out a section of unit three's patio in the area where the elevator and adjoining multi-level wooden staircase extended out from the southeast corner of the building. Knell also stated that, in his opinion, the Plan and the common areas depicted within it had been drawn in conformity with standard practices.

11

On cross-examination, Knell admitted the Plan's floor diagram did not include any specific designations showing where the stairways or elevators within the development were located. Knell explained it was "standard practice in the industry" not to include specific designations for stairways and elevators. Knell clarified, however, that the diagram did depict common areas in the locations where the elevator and multi-level wooden staircases were positioned. In contrast, the diagram did not depict any common area in the location where the disputed garage stairway was located. Knell stated that because the stairway was located within an area that had not been depicted as common area, he did "not believe it to be anything more than an emergency stairway."

Knell admitted that during his deposition he had initially described the garage stairway as a "common area." Knell explained that this comment was only intended to convey that the stairway was "common" to the extent "it can be used by . . . other people . . . in the case of emergency to get, say, from . . . a fire in the garage, from the garage to . . . out of the side. [sic.]" Knell then reiterated that, based on the "custom and practice in the industry," it was unlikely that a stairway located within an area designated as a separate interest would be intended as common area in the absence of some marking showing it as such.[7]

### b. Trial court's findings and judgment

After the parties submitted closing briefs, the trial court issued a tentative order concluding that the garage stairway was not intended to be common area. The court explained that it had previously found the governing documents to be "ambiguous" on the issue, thereby permitting the use of extrinsic evidence to aid in their interpretation. The court stated that it found Knell's testimony credible and persuasive: "[Schmidbauer] introduced the expert testimony of [Knell], who testified that the subject stairs would be expressly designated as 'common area' if they were intended to be common, but they

---

[7]    Schmidbauter, Christine Deelo and other witnesses testified at trial regarding the Deelos's prescriptive easement claim. Their testimony was not relevant to the interpretation of the governing documents.

were not so designated. He also testified that the subject stairs, per the condo plan, are for emergency use only. Additionally, the condo plan clearly shows the subject patio area as separate interest, not common interest. [The Deelos] did not provide contrary expert testimony, and the court finds [Knell's] testimony on this issue was convincing and credible. The court finds the governing documents are susceptible to the interpretation put forth by [Knell] and in the absence of contrary expert testimony, the Court finds [Knell's] interpretation must be accepted."[8]

Two weeks after the court issued its tentative order, the Deelos requested a statement of decision. Schmidbauer opposed, arguing that the Deelos were required to request a statement of decision before the matter had been submitted to the court. (See Code of Civ. Proc., § 632, subd. (n) [where trial is less than 8 hours, request for statement of decision must be made prior to submission of matter to the court]; see also California Rules of Court, rule 3.1590, subd. (n).) The trial court denied the request as untimely, adopted its tentative order as its final ruling and directed Schmidbauer to prepare a judgment.

The court subsequently entered a judgment stating that the "stairwell within 3C and the patio area designated as 3C are not common areas to be used by the Deelos, other owners of units in the complex, or any of their agents . . . or guests, but are instead . . . Schmidbauer's separately owned interest included as part of her Unit 3." The judgment also enjoined the Deelos and any successor owners of unit two "from entering unit 3's patio, designated as 3C in the Condominium Plan, and . . . from entering the subject stairwell that is within the patio designated as 3C" except in cases of emergency.

## DISCUSSION

The Deelos argue that the trial court committed multiple errors in interpreting the condominium development's governing documents. First, they contend the court was

---

**8** The court also found the Deelos had failed to establish they were entitled to a prescriptive easement over unit three's patio or the garage stairway. The Deelos have not appealed that portion of the judgment.

13

precluded from considering extrinsic evidence because there is no ambiguity in the governing documents.  Second, they argue that even if the court were permitted to consider extrinsic evidence, the most reasonable construction of the governing documents is that the garage stairway is part of the development's common area, not part of Schmidbauer's separate interest.

### A.  *Summary of Applicable Legal Principles and Standard of Review*

The parties do not dispute that the ordinary rules of contract interpretation apply when construing the governing documents of a common interest development.  (See generally *Christian v. Flora* (2008) 164 Cal.App.4th 539, 551 [applying rules of contract interpretation to common interest development declaration].)  "When possible, the parties' . . . intention is to be determined solely from the language of the [documents].  'The "clear and explicit" meaning of these provisions, interpreted in their "ordinary and popular sense," . . . controls judicial interpretation.'  [Citation.]  'Interpretation of a contract "must be fair and reasonable, not leading to absurd conclusions.  [Citation.]"'  [Citation.]"  (*Bill Signs Trucking, LLC v. Signs Family Ltd. Partnership* (2007) 157 Cal.App.4th 1515, 1521 (*Bill Signs Trucking*).)  "The whole contract must be considered together in order to 'give effect to every part, if reasonably practicable, each clause helping to interpret the other.'"  (§ 1641.)

If a contract is "ambiguous on its face, parol evidence is admissible to interpret it.  [Citation.]  Further, a [contract] is latently ambiguous if it appears clear on its face, but parol evidence shows it is reasonably susceptible to two or more interpretations.  [Citation.]  In that instance, the "'decision whether to admit parol [or extrinsic] evidence involves a two-step process.  First, the court provisionally receives (without actually admitting) all credible evidence concerning the parties' intentions to determine 'ambiguity,' i.e., whether the language is 'reasonably susceptible to the interpretation urged by a party.  If in light of the extrinsic evidence the court decides the language is 'reasonably susceptible' to the interpretation urged, the extrinsic evidence is then admitted to aid in the second step - interpreting the contract."'  [Citation.]  'The test of

admissibility of extrinsic evidence to explain the meaning of a written instrument is not whether it appears to the court to be plain and unambiguous on its face, but whether the offered evidence is relevant to prove a meaning to which the language of the instrument is reasonably susceptible.' [Citation.]" (*Bill Signs Trucking, supra,* 157 Cal.App.4th at p. 1521.)

"The trial court's threshold finding of ambiguity is a question of law subject to our independent review. The court's ultimate construction of ambiguous language is subject to our independent review if the extrinsic evidence is not in conflict, even when the parties draw different inferences from the evidence. If the extrinsic evidence conflicts, we uphold any reasonable construction supported by substantial evidence." (*Bill Signs Trucking, supra,* 157 Cal.App.4th at p. 1521; see also *Wolf v. Superior Court* (2004) 114 Cal.App.4th 1343, 1351 (*Wolf*).)

### B. The Trial Court Did Not Err in Permitting Extrinsic Evidence to Aid in the Interpretation of the Governing Documents

The Deelos initially contend the court erred by admitting extrinsic evidence because the only reasonable interpretation of the governing documents is that they designate the garage stairway as common area. In support, the Deelos cite language in the DOR stating that: (1) "stairways" are not part of any unit; and (2) any area that is not part of a unit is common area. The Deelos argue that because the DOR expressly excludes all "stairways" from the definition of a unit, the governing documents are not reasonably susceptible to the meaning offered by Schmidbauer (that the garage stairway is part of unit three).

This argument fails to address conflicting language in the Condominium Plan that suggests not all stairways within the development were intended to be excluded from the units. The Plan is expressly incorporated into the DOR and must therefore be treated as "an actual part" of the DOR. (*Republic Bank v. Marine Nat. Bank* (1996) 45 Cal.App.4th 919, 922.) In contrast to the text of the DOR, the Plan states that only "common stairways" are to be excluded from a unit. Neither the DOR nor the Plan expressly

15

defines what qualifies as a "common stairway." Thus, based solely on the language of the DOR and the Plan, it is unclear whether all stairways or only common stairways were intended to be excluded from the units. It is also unclear what qualifies as a "common stairway."

The Plan's floor diagram does not, standing alone, resolve these issues. The floor diagram merely illustrates what areas of the development are separate interests and what areas are common area. The floor diagram does not actually depict any of the stairways or other features in the development nor does it offer any further insights into what constitutes a common stairway.

Schmidbauer's extrinsic evidence, however, provides additional details about the stairways and common areas within the development. Schmidbauer's declaration and photographs indicate there is a wooden stairway attached to the northeast corner of the building that runs from the first floor to the third floor. On the Plan's floor diagram, the location of this stairway is depicted as common area that is blocked out from unit one's patio space. Schmidbauer's declaration and photographs also show there is a second exterior multi-level stairway that runs alongside the elevator shaft on the southeast corner of the building. On the floor diagram, the area where the elevator and adjacent stairway sit is depicted as common area that is blocked out from unit three's patio. Schmidbauer's evidence also establishes the position of the disputed garage stairway, which is located in an area of the floor diagram that is designated as part of unit three's patio and not depicted as common area. This evidence supports Schmidbauer's claim that the governing documents are properly interpreted as excluding from the definition of a unit only those stairways that are located within an area designated as "common area" on the floor diagram.

Knell's expert testimony provides additional support for this proposed interpretation. Knell explained that, under the industry customs and practices applicable to the drafting of condominium plan diagrams, any area located within a separate interest that was intended to be common area would be marked as such. He further testified that, consistent with these practices, the floor diagram in this case did appear to designate at

16

least one stairway that was located within a separate interest as common area: the multi-level stairway on the southeast corner of the building that encroached upon unit three's patio area. Knell testified that the absence of any similar demarcations in the area where the garage stairway was located suggested that the stairway was only intended to be used in emergency situations.

Considered together, the DOR, the Plan and the proffered extrinsic evidence demonstrate the governing documents are reasonably susceptible to the interpretation set forth by Schmidbauer. While the DOR states that "stairways" are excluded from any unit, the Plan's text and floor diagram, considered in conjunction with the extrinsic evidence, show that this language can be reasonably interpreted as meaning stairways located within areas that are denominated as common area on the floor diagram. The trial court therefore did not err in admitting the extrinsic evidence to aid in the interpretation of the governing documents.

### C. The Trial Court's Interpretation Is Supported by Substantial Evidence

Having concluded the court properly admitted extrinsic evidence, we next assess the trial court's ultimate construction of the governing documents. Preliminarily, however, we must determine the appropriate standard of review. As stated above, if the extrinsic evidence is not in conflict, "construction of the instrument is a question of law, and the appellate court will independently construe the writing." (*Winet v. Price* (1992) 4 Cal.App.4th 1159, 1166 (*Winet*).) "When the competent parol evidence is in conflict, and thus requires resolution of credibility issues, any reasonable construction will be upheld as long as it is supported by substantial evidence." (*Ibid.*; see also *Bill Signs Trucking, supra,* 157 Cal.App.4th at p. 1521; see also *Wolf, supra,* 114 Cal.App.4th at p. 1351.)

The Deelos argue that "the trial court did not base its interpretation of the [DOR] and [the Plan] on any credibility issue concerning conflicting extrinsic evidence. Accordingly, this Court is obliged to conduct de novo review and exercise its independent judgment concerning the proper interpretation of the [governing documents]." Schmidbauer disagrees, contending that we should apply the more

17

deferential "substantial evidence" standard of review because the trial court "was called upon to evaluate extrinsic evidence," including its own visual inspection of the premises, expert Knell's testimony and various photographs.

The record demonstrates that the trial court's interpretation of the governing documents was predicated in substantial part on David Knell's expert testimony regarding the customs and standard practices that govern condominium plan diagrams. (See *Midwest Television, Inc. v. Scott, Lancaster, Mills & Atha* (1988) 205 Cal.App.3d 442, 452 (*Midwest*) ["Evidence of custom or standard practice is admissible to interpret the terms of a contract and to imply terms when no contrary intent is apparent from the other terms of the contract"].) Knell testified that, customarily, if an area within a separate interest was intended to be common area, the floor diagram would show that area blocked out from the separate interest. He further testified that if an external stairway was located within a separate interest, but not marked as common area, the stairway would normally be intended for emergency use only.

The Deelos do not concede that Knell's testimony properly reflects industry customs and standard practices. Instead, they assert Knell's testimony is not credible because it is "self contradicting," lacks "factual foundation" and merely "expresse[s] his belief on how the case should be decided." The Deelos raised similar arguments in their post-trial closing brief, asserting that the trial court should discount Knell's conclusions because he previously admitted at deposition that the garage stairway was a form of common area and that condominium plan diagrams generally do not depict stairways. Given the Deelos's objections to Knell's expert testimony both at trial and on appeal, it is apparent that the extrinsic evidence was—and is still—in conflict. (See *Warner Constr. Corp. v. City of Los Angeles* (1970) 2 Cal.3d 285, 291-292 [interpretation of contractual language that "depends on the credibility of [a single expert's] testimony" is a question of fact]; *Winet, supra,* 4 Cal.App.4th at p. 1166 ["parol evidence is in conflict [when it] . . . requires resolution of credibility issues"].) Accordingly, we must uphold the trial court's interpretation of the governing documents if it is reasonable and supported by substantial evidence.

Knell's testimony constitutes substantial evidence supporting the trial court's interpretation. (See *Bailey v. Breetwor* (1962) 206 Cal.App.2d 287, 291 [expert testimony is permitted "as to the proper interpretation of technical words used in . . . contracts"].) Although the Deelos assert we should not credit Knell's testimony because he made conflicting statements during his deposition and on cross-examination, "we defer to the [trial] court's determination of the witnesses' credibility." (See *Benach v. County of Los Angeles* (2007) 149 Cal.App.4th 836, 847-848.)[9]

The court's ruling is also supported by evidence showing that the Plan's floor diagram did in fact block out areas within separate interests where other stairways were located. Specifically, the floor diagram blocked out sections of unit one and three's patios where the northeast and southeast multi-level wooden stairways are located. The diagram did not, however, block out the area of unit three's patio where the garage stairway is located.

---

[9]    The Deelos also argue that none of Knell's testimony was admissible because it concerned issues of law and "legal conclusion[s]." (See generally *Nevarrez v. San Marino Skilled Nursing and Wellness Centre* (2013) 221 Cal.App.4th 102, 122 ["an expert may not testify about issues of law or draw legal conclusions"].) The Deelos contend Knell did nothing more than provide his own personal interpretation of the governing documents, which was a matter for the trial court to decide. We disagree. During Knell's testimony, the court specifically clarified that it would not permit or consider testimony "regarding [Knell's] specific [understanding] of this condominium plan" or his legal conclusions. The court further stated that it would only allow (and only consider) evidence on "[Knell's] understanding of what the standard practice is[;] . . . . his understanding of what the standards are as to common areas and not common areas." Consistent with these statements, the trial court repeatedly directed Knell to explain how common areas would normally be depicted on a condominium plan and the factual significance of certain markings in light of industry customs and practices. The mere fact that Knell's testimony may have embraced the ultimate issue to be decided by the court does not render the testimony inadmissible. (See Evid. Code, § 805 ["Testimony in the form of an opinion that is otherwise admissible is not objectionable because it embraces the ultimate issue to be decided by the trier of fact"]; *Wells Truckways, Ltd. v. Cebrian* (1954) 122 Cal.App.2d 666, 674 [fact that expert witness's expression of opinion may be adopted by court as basis for ultimate decision does not mean that such witness is deciding case or usurping court's functions, as court may or may not accept witness's opinion].)

19

Moreover, it is undisputed that the court, acting at the parties' request, actually viewed the premises and examined the access ways and pathways at issue in this matter. "'When the trial judge views the premises in question during a trial what he sees is not a part of the transcript of the record but is independent evidence which may be considered by him in arriving at his decision and which this court will assume supports the findings. [Citing cases.]'" (*Endara v. City of Culver City* (1956) 140 Cal.App.2d 33, 41; see also *South Santa Clara Val. Water Conservation Dist. v. Johnson* (1965) 231 Cal.App.2d 388, 399 ["it is . . . well settled that when the trial judge views the premises and a record of what he saw has not been made a part of the transcript on appeal, an appellate court must assume that the evidence acquired by such view is sufficient to sustain the finding in question"].) Thus, although not included in the record, we must presume that whatever the court saw while viewing the premises supported its conclusion that the garage stairway was not intended to be common area. (*Kraemer v. Superior Oil Co.* (1966) 240 Cal.App.2d 642, 648 ["The court viewed the premises and although the record does not and could not disclose what he saw, so long as his view of the premises was authorized that which he did see is as much supporting evidence for his findings as is any proof in the record"]; *Downey v. Santa Fe Transp. Co.* (1955) 134 Cal.App.2d 720, 725-726 [when the record does not disclose what the trier of fact saw during its viewing of the premises, the reviewing court "is required to presume" the evidence supported the judgment].)[10]

The Deelos argue that even if the court's interpretation is supported by substantial evidence, it must nonetheless be rejected as unreasonable. (See *Winet, supra*, 4 Cal.App.4th at p. 1166 ["[w]hen . . . parol evidence is in conflict, . . . any reasonable

---

[10] The Deelos contend we should not consider the fact that the trial court viewed the premises because the court did not reference this evidence in its final minute order or the judgment. The Deelos have cited no authority suggesting that, under the substantial evidence standard, we may only consider evidence that is specifically referenced within the order or judgment at issue. This argument conflicts with the well-established rule that the "determination whether there was substantial evidence to support a finding or judgment must be based on the whole record." (*Rivard v. Board of Pension Commissioners* (1985) 164 Cal.App.3d 405, 412.)

20

construction will be upheld as long as it is supported by substantial evidence"].) The Deelos first assert that the court's interpretation is unreasonable because it would require tenants of units one and two to access the parking structure by exiting through the front door of the development onto Pacific Street, and then re-entering through the pedestrian doorway of the parking structure. According to the Deelos, forcing tenants to leave the "secure" area of the building to access their vehicles is an absurd and "extraordinarily harsh result, given the serious safety concerns adduced at trial." The only evidence the Deelos cite in support of this argument is Christine Deelo's testimony that she had seen homeless people outside the building and heard about criminal activity in the area. On cross-examination, Deelo admitted she had never reported any of these purported safety concerns to the police.

Christine Deelo's current safety concerns regarding homeless people and neighborhood crime have no relevance to the interpretation of governing documents that were written more than 25 years before she purchased her condominium. To the extent such evidence had any relevance, we must presume the trial court found that Deelo's purported safety concerns did not render its interpretation of the governing documents extraordinarily harsh. (See *Fladeboe v. American Isuzu Motors, Inc.* (2007) 150 Cal.App.4th 42, 48 ["[u]nder the doctrine of implied findings, the reviewing court must infer, following a bench trial, that the trial court impliedly made every factual finding necessary to support its decision."].) This implied finding is supported by Deelo's admission at trial that she never contacted law enforcement about her alleged safety concerns. The finding is also supported by the fact that the trial court actually viewed the premises and was therefore able to assess her safety claims.

The Deelos next contend that the court's conclusion that the garage stairway was only intended for emergency access, rather than as common area, is unreasonable because "there is absolutely no 'emergency use only' restriction found in [the governing documents]." According to the Deelos, the trial court impermissibly read a provision into the governing documents that simply does not exist. This argument overlooks that Knell's expert testimony regarding industry customs and standard practices was

21

admissible not only to interpret the explicit terms of the governing documents, but also to "imply terms when no contrary intent is apparent from the other terms of the [documents]." (*Midwest, supra*, 205 Cal.App.4th at p. 451.) Knell testified that: (1) based on his expertise as a condominium plan surveyor, a stairway located within a separate interest that was not designated as common area would customarily be intended for emergency egress, rather than for everyday use; and (2) the Plan's floor diagram appeared to have been prepared in conformity with standard customs and practices. Because there is no provision in the governing documents that specifically addresses how stairways that lead from a separate interest area to a common area (the parking structure) are to be treated, the court was permitted to imply this term based on Knell's expert testimony.

Third, the Deelos argue the court's interpretation is unreasonable because it conflicts with and renders meaningless language in the DOR and the Plan that "exclud[es] stairways . . . from unit ownership." As explained above, however, the governing documents do not state that all stairways within the development are excluded from the definition of a unit. Although the DOR contains general language stating that "stairways" are to be excluded from units, the incorporated language of the Plan states that only "common stairways" are to be excluded from the unit. "[U]nder well established principles of contract interpretation, '. . . when a general and a particular provision are inconsistent, the particular and specific provision is paramount to the general provision.' [Citations] (*National Ins. Underwriters v. Carter* (1976) 17 Cal.3d 380, 386 [citing § 3534, Code of Civ. Proc., § 1859].) Applying those principles here, the trial court could reasonably conclude that the term "stairway" in the DOR was intended to mean "common stairway" as stated in the incorporated Plan. Based on the evidence at trial, the court could also reasonably conclude the term "common stairways"

22

was only intended to refer to stairways within the development that were located in areas designated on the floor diagram as common area.[11]

## DISPOSITION

The trial court's judgment is affirmed.  Schmidbauer shall recover her costs on appeal.

ZELON, J.

We concur:

PERLUSS, P. J.

WOODS, J.

---

[11]    The Deelos also argue that Civil Code section 4505 and language in the governing documents establish an easement over any portion of a separate interest that is necessary to access common area, thereby entitling them to use unit three's patio walkway to access the garage stairway.  Because we affirm the trial court's finding that the garage stairway was not intended to be common area, we need not assess this argument.  We also reject the Deelos's conclusory contention that, in deciding the merits of the case, the  court failed to conduct "an independent . . . review and interpretation of the legal effect of the governing documents."  This argument is belied by the judgment itself, which specifically states that the trial court considered all of the "evidence at trial" and specifically references the Condominium Plan and the DOR.

SCALE 1"=20'  CONDOMINIUM PLAN FOR LOT 1 OF  SHEET 5 OF 7 SHEETS

# TRACT NO. 23404

IN THE CITY OF SANTA MONICA COUNTY OF LOS ANGELES
STATE OF CALIFORNIA
WAGNER-KERR ASSOCIATES, INC.

NOTE:
ALL DIMENSIONS BETWEEN AIR SPACES 0.4' UNLESS
OTHERWISE NOTED.



PACIFIC        STREET

